CHIEF JUSTICE McGRATH
delivered the Opinion of the Court.
¶1 This is an appeal by Jaydon Pauli from the November 26, 2007, order of the District Court of the Sixth Judicial District, Park County, granting summary judgment to Park County and the State of Montana. We reverse.
*467 ¶2 Pauli presents issues for review that we restate as follows:
¶3 Issue One: Whether the District Court erred in holding that the County did not have a duty to Pauli concerning his transport as a prisoner from Florida to Montana to respond to a probation revocation.
¶4 Issue Two: Whether the District Court erred in holding that the State did not have a duty to Pauli concerning his transport as a prisoner from Florida to Montana to respond to a probation revocation.
PROCEDURAL AND FACTUAL BACKGROUND
¶5 Pauli received a deferred sentence for burglary and theft in 2000 from the Sixth Judicial District Court, Park County, and was placed on probation. He failed to report to his probation officer and traveled to Florida without permission. In 2001 the State commenced probation revocation proceedings and transported Pauli from Florida to Montana using a private prisoner transportation service called Extraditions International. When Pauli arrived in Park County he complained to the Sheriff that the trip from Florida had been “torture” and that he had been poorly treated.
¶6 The result of the 2001 probation revocation proceeding was that Pauli was sentenced to the Montana Department of Corrections for six years, all suspended, and was placed on probation under the supervision of the Adult Probation and Parole Division of the Montana Department of Corrections (DOC). Pauli obtained permission from Montana Adult Probation and Parole to move to Florida, where he was subject to supervision by probation officials of the State of Florida pursuant to the Interstate Compact for Adult Offender Supervision, § 46-23-1115, MCA.
¶7 In December 2002, Pauli’s Florida probation officer informed Montana Adult Probation and Parole that Pauli had violated the conditions of his probation. Based upon this report, the Montana DOC prepared a report of violation, a recommendation that Pauli’s probation be revoked, and a request that a warrant issue for his arrest. The DOC report was sent to the Park County Attorney, who prepared and filed a petition in the District Court to revoke Pauli’s probation. The District Court issued a warrant for Pauli’s arrest, and it was executed by authorities in Florida in February, 2003. Pauli was held in custody without bond ‘for Montana” by Florida authorities.
¶8 The Park County Sheriff s office then became involved in arranging to transport Pauli to Montana. The Sheriffs office contacted a private prisoner transportation service called American Extraditions (AEI), a successor to Extraditions International that had transported Pauli to Montana in 2001. After receiving a price quote for the trip, the Sheriff s *468 office followed required State procedure and contacted the Montana Governor’s office to obtain approval of the expenditure.
¶9 The State of Montana maintains a Prisoner Transportation Fund to reimburse counties for the costs of transporting prisoners. Beginning in 1993, Gov. Marc Racicot, as a cost-cutting measure, required that counties obtain prior approval for the use of state prisoner transportation funds. A letter from the Governor announcing this policy cautioned that only prisoners charged with more serious offenses and with higher bonds should be considered for interstate transportation. The policy encouraged the use of private prisoner transportation services for long-distance interstate transport.
¶10 AEI employees picked up Pauli from Florida authorities in February, 2003. He was shackled at the wrists and ankles and placed in a large passenger van with other prisoners. The van had two uniformed drivers employed by AEI, who were in charge of the prisoners during the nine-day trip from Florida to Montana. The van was equipped with a divider between the prisoners and the drivers that allowed the drivers to observe the prisoners. The prisoners were shackled but the van did not have seatbelts and did not have toilet facilities for their use.
¶11 Pauli’s complaint alleged that he and the other prisoners were mistreated during the trip primarily by being denied sufficient toilet stops. He alleges that the drivers would stop to relieve themselves, but would not allow the prisoners to do so, and that this resulted in the prisoners defecating and urinating on themselves and in the van during the trip.
¶12 On March 5, 2003, the van was on the interstate highway near Dillon, Montana. Pauli’s complaint alleges that the prisoners had not been provided a bathroom break in many hours, and that the drivers had told them to urinate into plastic cups or water bottles. Pauli alleges that as the prisoners were urinating into plastic containers the AEI driver was watching them and laughing, while swerving the van trying to cause them to spill urine on themselves. In so doing, the driver lost control of the van and it rolled several times, coming to rest on its top. The other AEI driver was killed in the accident and Pauli alleges that he was injured.
¶13 AEI had no insurance and dissolved after the accident, leaving persons with claims with no practical recourse against AEI for loss or injury. Taking at face value the defendants’ assertions that they had no knowledge of AEI’s practices, it is clear that neither undertook to ascertain whether AEI had a safe operation, whether AEI was bonded or insured, or whether AEI adhered to minimum standards for the care *469 and custody of prisoners. Both the State and the County adamantly disclaim any control, oversight, or even knowledge of the practices and procedures of AEI. AEI was therefore left entirely to its own devices, at least as far as the State and County were concerned.
¶14 Pauli brought suit against Park County and the State, alleging that they were responsible for his injuries. The County and State answered and moved for summary judgment. After allowing Pauli a period in which to conduct discovery and after briefing and oral argument, the District Court granted summary judgment to the County and State. Pauli appeals.
¶15 The County and the State each argued below that they owed no actionable duty to Pauli because his injuries were inflicted by AEI or its employees. The State contended that it had no connection to AEI and that neither AEI nor the County was its agent in transporting Pauli. The County made similar arguments, and further contended that it owed no duty to Pauli because it was not foreseeable that injury to him might result from hiring AEI and seeking approval of the transportation costs.
¶16 The District Court held that the State owed no duty to Pauli because it did not have any contractual or agency relationship with AEI. As to the County, the District Court held that a contractor-independent contractor relationship existed between the County and AEI, and therefore the County had no duty either.
STANDARD OF REVIEW
¶17 We review a district court’s rulings on summary judgment de novo, applying the same criteria as the district court under M. R. Civ. P. 56. Beckman v. Butte-Silver Bow County, 2000 MT 112, ¶ 11, 299 Mont. 389, 1 P.3d 348.
DISCUSSION
¶18 Issue One: Whether the District Court erred in holding that the County did not have a duty to Pauli concerning his transport from Florida to Montana to respond to a probation revocation.
¶19 In Beckman the plaintiff was employed by a company that was excavating and constructing a water pipe line for Butte-Silver Bow Comity. Beckman was injured when the trench where he was working collapsed. Beckman sued the County, which contended that it was not liable for Beckman’s injuries under the general rule that contractors are not liable for torts of their independent contractors. This Court noted that there are exceptions to the general rule, which include (1) where there is a nondelegable duty based on a contract; (2) where the activity *470 is inherently or intrinsically dangerous; and (3) where the general contractor negligently exercises a reserved right of control over a subcontractor’s work. Beckman, ¶ 12.
¶20 The primary issue in Beckman was whether the work was inherently dangerous so as to come within the second exception to the general rule, applying §416 and 427 of the Restatement (Second) of Torts. Those sections allow a general contractor to be liable for the acts or omissions of an independent contractor when the work involves a “peculiar risk of harm” or a “special danger to others.” This Court held that contractors are not liable for every tort by an independent subcontractor engaged in such inherently dangerous work, but only those “torts which arise from the unreasonable risks caused by engaging in that activity.” Beckman, ¶ 22. We abandoned distinctions made in earlier cases based upon whether dangers could be avoided by standard precautions or required special precautions. Instead, we adopted a rule that a contractor ‘is' vicariously liable for injuries to others caused by a subcontractor’s failure to take precautions to reduce the unreasonable risks associated with engaging in an inherently dangerous activity.” We concluded that trenching operations are inherently dangerous as a matter of law. Beckman, ¶ 24. Therefore, Butte-Silver Bow County could be liable for torts committed by its independent contractor.
¶21 Other activities have been considered under Montana law and held to be inherently dangerous. Ulmen v. Schwieger, 92 Mont. 331, 12 P.2d 856 (1932) (highway construction); Stepanek v. Kober, 191 Mont. 430, 625 P.2d 51 (1981) (construction scaffolding); Cash v. Otis Elevator, 210 Mont. 319, 684 P.2d 1041 (1984) (elevators); Brewer v. Ski Lift, 234 Mont. 109, 762 P.2d 226 (1988) (skiing); McMillan v. U.S., 112 F.3d. 1040 (9th Cir. 1997) (felling snag trees, applying Montana law); Oberson v. U.S., 2007 MT 293, 339 Mont. 519, 171 P.3d 715 (snowmobiling). Whether an activity is inherently dangerous is a question of law. Fabich v. PPL Montana, 2007 MT 258, ¶ 32, 339 Mont. 289, 170 P.3d 943.
¶22 The first step in applying this law to the County is determining whether it was in a contractor-independent contractor relationship with AEI.[1] The County does not contest the District Court’s determination *471 that there was a contractual relationship between it and AEI. Rather, the County argues that none of the Beckman exceptions applies and therefore it is not vicariously liable for any torts of AEI. The District Court so held, concluding that the activity undertaken by AEI was “driving” and that driving is a common activity which is not inherently dangerous. We disagree and hold that the transportation of prisoners is more than just driving and is an inherently dangerous activity. Therefore, under Beckman, a county or other governmental entity that contracts to have prisoners transported may be held vicariously liable for injuries caused by an independent contractor that provides prisoner transport services. Any such claim must still be established under the ordinary rules of negligence, requiring proof of the existence of a legal duty, breach of duty, causation and damages, on the part of the contractor. Causenbary v. Mortensen, 1999 MT 221, ¶ 21, 296 Mont. 25, 987 P.2d 351.
¶23 We reach this conclusion because there are multiple dangers inherent in prisoner transportation that separate it from ordinary driving. The transportation of prisoners is, by its nature, a unique and inherently dangerous activity. The risks arising from that activity apply not only to the prisoners and transport employees but to the public at large. The most obvious danger is that those being transported are often persons charged with or convicted of serious criminal offenses. The 1993 policy by Gov. Racicot expressly directed that the counties transporting prisoners should choose to transport prisoners with prior criminal records, more serious offenses, and higher bonds. The policy also encouraged counties to select private contractors for interstate transport services. The policy therefore expressly promotes situations in which private non-law enforcement contractors will be transporting serious offenders across the country. This is not ordinary driving.
¶24 When such prisoners are transported, especially over long distances over multiple days that require at least some stops along the way, security concerns make even food and bathroom stops potentially dangerous events. Prisoner escape is clearly always a concern and danger. See State v. Savaria, 245 Mont. 224, 800 P.2d 696 (1990) (escape during transport to a court appearance). Prisoners who escape *472 or attempt to escape during transport present an inherent danger to themselves, to the guards or others charged with securing them, and to the public. The County notes that there are Federal regulations, found at 28 C.F.R. pt. 97 (2008), setting standards for “private companies that transport violent prisoners on behalf of State and local jurisdictions.” 28 C.F.R. §97.1. The regulations apply only to the transportation of violent prisoners, and set minimum standards for such things as employee training and background checks, driving times, uniforms and identification. The regulations also specify mandatory restraints for prisoners (28 C.F.R. §97.17); notification of local law enforcement 24 hours in advance of any scheduled stops (28 C.F.R. §97.18); immediate notification of local law enforcement if there is an escape (28 C.F.R. § 97.190); and adoption of policies to protect the health and physical safety of the prisoners (28 C.F.R. §97.20). The regulations expressly do not pre-empt any applicable state or local regulations (28 C.F.R. § 97.22). The federal regulations serve to enforce the conclusion that interstate prisoner transportation is an inherently dangerous activity.
¶25 When long-distance interstate transportation of prisoners is undertaken, it presents even higher dangers. In Pauli’s case the transported prisoners were restrained with wrist and ankle shackles and were confined in the van behind a partition that separated them from the drivers. There was no toilet facility in the van and the complaint alleges that few toilet breaks were provided. It should come as no surprise that prisoners confined in squalid and painful conditions, as alleged in this case, would be more likely to become aggressive and hostile and more likely to attempt escape or engage in other dangerous activities than if they were treated humanely and were transported expeditiously. Pauli’s trip from Florida to Montana took nine days, getting only as far as the Dillon area before the accident happened.
¶26 The complaint alleges that AEI provided staff who failed to provide for the basic physical needs of the prisoners during the trip. Perhaps most importantly, AEI provided staff who, as alleged in the complaint, built upon that failure by purposely driving in a dangerous and erratic manner precisely because there were disgruntled prisoners in the back of the van. While the defendants describe the accident as resulting from the driver swerving, the complaint alleges that the driver was taunting the prisoners by deliberately swerving the van in an attempt to cause them to spill urine on themselves. This alleged behavior, which at this point has not been proven or disproven, led to death and injury.
¶27 Law enforcement agencies have complex hiring processes with the goal of selecting well-qualified personnel who are then trained for activities such as prisoner transport. Law enforcement administrators *473 understand the dangers posed to the public, to law enforcement personnel and to those in custody by inadequate hiring, training and supervision of officers. When a similar level of care is not applied to law enforcement related activities like interstate prisoner transportation, tragic events such as the crash in this case can occur.
¶28 The conduct of the AEI driver that allegedly led to the crash was not some kind of innocent ‘horseplay.” The misconduct alleged by Pauli arose because the van was transporting prisoners on an extended interstate trip, and because those prisoners were complaining to the driver about the conditions under which they were being held. This aspect of the event is therefore a result of the inherent risk of the enterprise of prisoner transportation.
¶29 Long distance prisoner transportation, like the trenching in Beckman, is an inherently dangerous activity as a matter of law. Here, while the injury to the plaintiff did not occur as a result of the typical unreasonable or unique risks inherent in prisoner transport-such as attempted escape or assault by prisoners-it arguably occurred in this case as a result of the failure of the State or the County to take any precaution whatsoever to provide for the safe and humane transport of the prisoners. Furthermore, as alleged in the complaint, the accident occurred because prisoners were being transported in unacceptable conditions. It was foreseeable that those alleged conditions could have caused unrest among the prisoners, conflicts with the guard drivers and a crash of the van. It was foreseeable because, in this situation, unlike other activities previously deemed inherently dangerous (e.g., trenching, scaffolding, log transport) there are two factions of persons-eaptors and captives-eonfined in a small uncomfortable space that can foster mutual animosity one toward the other. In such a potentially hostile environment, it is foreseeable that an action by one group can trigger a quick and potentially dangerous reaction from the other. The mix of these potentially antagonistic forces is a material factor that makes prisoner transport inherently dangerous.
¶30 We affirm our holding in Beckman that a contractor is not liable for every tort by an independent subcontractor engaged in inherently dangerous work, but only those torts which arise from risks caused by engaging in such dangerous activity. Considering the singular circumstances of this case, we conclude that the risk of driver misconduct was an inherent danger in the transportation of prisoners, which is inherently dangerous work, and that it is a part of the peculiar risk of harm which arose from engaging in that activity. See Beckman, ¶ 22. Thus, the tortious conduct alleged by Pauli falls within an exception to the rule that a contractor may not be held liable for the *474 torts of an independent subcontractor. Under Beckman, the County may therefore be subject to vicarious liability for the acts or omissions of its contractor, AEI.
¶31 Issue Two: Whether the District Court erred in holding that the State did not have a duty to Pauli concerning his transport as a prisoner from Florida to Montana to respond to a probation revocation.
¶32 The situation of the State in this case is different. Pauli alleges negligence and asserts an agency relationship. The State emphasizes that there was no direct contact between it and AEI. Under the facts as alleged and presented to the District Court in the summary judgment proceedings, the State’s connection to AEI was to constrain and approve the County’s selection of AEI and to agree to reimburse the County for the cost. However, AEI, a private enterprise that no longer exists, had no independent authority to confine Pauli and transport him in shackles from Florida to Montana absent authority from the State of Montana to do so. When Pauli was arrested in Florida and held ‘for Montana,” the power and responsibility to confine and transport him arose from the State of Montana. Without some actual or apparent authority derived from the State, AEI had no basis for shackling Pauli, confining him, and transporting him across the country.
¶33 The District Court considered but rejected Pauli’s argument that the State had a-duty to transport him safely and humanely. Pauli asserted, for example in his Prediscovery Disclosures filed in the District Court on June 19, 2007, that the State could not avoid the consequences of that duty by delegating responsibility for transporting him to the County or AEI. The State concedes that it owes a duty of ordinary care to prisoners in its actual custody. We disagree that the State’s duty ends when the prisoners are not in the State’s actual custody. Pauli was a person convicted by and sentenced under the authority of the State of Montana. He was granted probationary status and ordered to live under a set of restrictions imposed by the State District Court, and was supervised by State employees. He was required to obtain permission from the State of Montana to travel to Florida. When Florida authorities informed the State that Pauli had violated conditions of probation, the State of Montana commenced a proceeding to revoke his probation and to have him arrested by Florida authorities. The purpose of bringing Pauli back from Florida was a probation revocation proceeding in State court, the consequences of which could be to either extend the State’s supervision over him or incarcerate him in the State prison.
¶34 When Pauli was in Florida he was supervised on probation by Florida authorities pursuant to the Interstate Compact for Adult *475 Offender Supervision. Section 46-23-1115, MCA. The purpose of the Compact is to promote public safety, protect rights of victims through control and regulation of interstate movement of offenders, to provide for the supervision of offenders in the member states, and “to equitably distribute the costs, benefits and obligations of the compact among the compacting states.”Section 46-23-1115, Article 1(2), MCA. The Compact also provides:
The states entering into this compact recognize that they are responsible for the supervision of offenders who are authorized pursuant to this compact to travel across state lines to and from the compacting states, and that the compacting states are responsible for tracking the location of offenders, transferring supervision authority in an orderly and efficient manner, and when necessary, returning an offender to the originating jurisdiction.
Section 46-23-1115, Article 1(1), MCA. This subsection of the Compact, which is part of Montana law, recognizes the State’s responsibility for its probationers, and for returning offenders when necessary. Moreover, officers of this State may enter another state at any time to apprehend an offender under supervision there. Section 46-23-1115, Article 1(4), MCA.
¶35 Probation is an “act of grace” by the sentencing court, State v. Boulton, 2006 MT 170, ¶ 15, 332 Mont. 538, 140 P.3d 482, that results in a “form of contract” between the sentencing court and the probationer. State v. Burke, 235 Mont. 165, 171, 766 P.2d 254, 257 (1988). Like incarceration, probation is a restrictive criminal sanction that represents one point on a continuum of possible punishments. Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S. Ct. 3164, 3168-69 (1987). Restrictions placed on probationers are imposed to insure that probation is a period of rehabilitation and that the community is not harmed by the probationer’s being at large. Griffin, 483 U.S. at 875, 107 S. Ct. at 3169. Probation is a status of conditional liberty depending upon adherence to the state’s special restrictions and conditions. State v. Boston, 269 Mont. 300, 305, 889 P.2d 814, 816 (1994). The State’s probation supervision system assumes that probationers are more likely than average to commit crimes in the community. State v. Moody, 2006 MT 305, ¶ 20, 334 Mont. 517, 148 P.3d 662. Contrary to the State’s argument, its involvement was much more significant than merely approving funds to pay for the transportation costs.
¶36 For these reasons Pauli was in a continuing relationship with the State of Montana during the time it chose to return him from Florida to face proceedings in the courts of this State. It was the State that *476 wanted Pauli returned to Montana to answer to its process. Pauli was under State authority and supervision. It was the State that caused him to be arrested in Florida and to be held ‘Tor Montana.” Pauli was Montana’s prisoner at least from the time he was picked up by AEI from the arresting law enforcement authorities in Florida. No contractor-independent contractor relationship between the State and AEI is alleged or shown in the record. AEI was acting as the State’s agent in transporting Pauli.
¶37 Florida authorities surrendered Pauli to the officers of AEI, who under the allegations of the complaint operated as agents of the State of Montana, for whom Florida was holding the prisoner. The Restatement (Second) Agency provides for liability by a principal who has a duty to protect another from harm caused by its agent.
A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others from harm caused to them by the failure of such agent to perform the duty.
Restatement (Second) Agency, §214. We adopt Restatement (Second) Agency, §214, as an appropriate statement of the law in Montana.
¶38 We hold that the State had a duty to exercise ordinary care in returning Pauli to Montana to answer its probation revocation proceeding. This does not mean that the State may not use a private contractor or other means to transport prisoners like Pauli. It does not mean that the State is strictly liable for any injury that results from prisoner transportation regardless of fault. It does mean, however, that if the State chooses to transport prisoners by allowing other entities to do the work, it may be held liable for the tortious acts or omissions of its agents undertaking the transportation. See Nazareth v. Herndon Ambulance Service, 467 So.2d 1076 (Fla. App. 1985).
¶39 Whether there were acts or omissions of AEI that caused injury to Pauli for which the State or County may be liable will have to be determined by further proceedings in the District Court. For the reasons discussed above, we reverse the District Court’s decision to grant summary judgment for the defendants and remand for further proceedings consistent with this opinion.
JUSTICES NELSON, WARNER, COTTER and MORRIS concur.

 None of the parties on appeal discusses why the County was responsible for arranging transportation of Pauli from Florida to Montana. The County Sheriff did not execute the District Court’s arrest warrant, the law enforcement authorities in Florida did, and the warrant itself was not made part of the record on appeal. There are statutes that provide for reimbursement to sheriffs for conveying persons to a *471 “magistrate or to a detention center” (§ 7-32-2143, MCA) and for reimbursement of expenses incurred in returning fugitives apprehended outside the county (§7-32-2145, MCA). Neither of these statutes places an express duty on a sheriff to assume responsibility of bringing a State prisoner to Montana from another state. The County nonetheless assumed the responsibility for Pauli’s transport from Florida, and since no party raised the issue of whether the County was in fact legally responsible we will not address it further.