DA 12-0607

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 272

DICK IRVIN INC.,

      Third Party Plaintiff and Appellant,

  v.

STATE OF MONTANA,

      Third Party Defendant and Appellee.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDV 08-314(b)
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          William J. Gregoire; Michael L. Rausch; Smith, Walsh, Clarke & Gregorie, PLLP; Great Falls, Montana

      For Appellee:

          Maxon R. Davis; Davis, Hattley, Haffeman & Tighe, P.C.; Great Falls, Montana

Submitted on Briefs:  May 28, 2013
Decided:  September 24, 2013

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     Dick Irvin, Inc. (Irvin) appeals from the Order of the Eighth Judicial District Court, Cascade County, denying Irvin's motion for summary judgment on the issue of duty in its negligence action against the State of Montana and United Rentals Highway Technologies, Inc. (collectively, State) and granting judgment in favor of the State.

## ISSUES

¶2     The issues on appeal are as follows:

¶3     *Did the State owe a statutory, nondelegable duty to Irvin?*

¶4     *Did the State owe a common law duty to Irvin?*

¶5     *Was the State vicariously liable for the torts of contractors working on this road project?*

¶6     *Did the District Court err when it determined Irvin is not entitled to summary judgment?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶7     This case arose after Keith Davies (Davies), who worked for Great Falls Sand and Gravel (GFSG), was run over by a tractor-trailer driven by Paul Tychsen (Tychsen), who worked for Irvin. Davies was directing traffic and had his back to the turning truck when it struck him.

¶8     The incident occurred during a project to construct a Flying J Travel Plaza in Great Falls. To accommodate large semi-trucks and tractors accessing the Plaza, 31st Street Southwest in Great Falls needed to be widened. Flying J hired Deerfield Construction as the

2

general contractor. GFSG subcontracted for the road work. GFSG completed most of the paving in 2004. In 2005, a portion of the roadway remained unpaved. The City of Great Falls requested repaving on a portion.

¶9 Common access to 31st Street Southwest occurs by turning south off Interstate 15 (I-15) at the airport exit (Gore Hill Interchange). Whether this portion of 31st Street Southwest is a state highway remains in dispute; however, the District Court observed "it appears that the accident itself occurred on a state right of way." The State did not request or pay for the paving or repaving. At the time of the accident the State was not aware that the City of Great Falls had directed GFSG to do the work or that repaving work was occurring.

¶10 In "Special Provisions" dated March 1, 2000, the State provided supplemental conditions with which the contractors were required to abide. Those provisions required Flying J to:

> Prior to the start of construction develop and submit to the Engineer for approval, a traffic control management plan to provide for the movement and safety of traffic through the project during construction.

> Submit a revised plan whenever a change in work schedule significantly effects [*sic*] traffic control. Provide a traffic control management plan including as a minimum the following requirements…

> (5) Include the intended traffic control method including flagging and spacing and type of traffic control devices. Provide traffic control in compliance with the current Manual on Uniform Traffic Control Devices.

Those provisions also stated:

> This project (31st Southwest) is a Montana Department of Transportation (MDT) project. The Contractor is required to provide all required submittals and adhere to all applicable MDT standards for construction. Applicable

3

> specifications for the roadway construction is the "Standard Specifications for Road and Bridge Construction, 1995 Edition." The owner will employ a full time representative (engineer) to provide construction inspection services.
>
> It is the Contractor's responsibility to be familiar with all MDT special provisions, standards, specifications, and construction requirements.

The provisions required that flaggers provided possess current certification from either the Montana Flagger training program, the ATSSA[1] flagger program, or Idaho, Oregon or Washington state flaggers training programs. The record provides no indication that the State required use of flaggers to control traffic, although the State's Maintenance Chief, David Kelly, testified he advised GFSG that if it did have flaggers it needed to have proper signs in place.

¶11    In April, 2000, before work began, Flying J and the Montana Department of Transportation (MDT) entered into a Memorandum of Agreement (MOA) for Roadway Improvements Interstate 15 Gore Hill Interchange. The MOA provided that "the Developer has proposed a travel plaza…southeast of the Interstate 15 Gore Hill Interchange which will affect the roadway under the authority of MDT…" and that "the parties set forth the duties and responsibilities necessary to address the needs of the traveling public due to the resulting impact on traffic flow on the affected MDT roadway resulting from the Developers proposed actions." To this end, the MOA required that "…Developer's contractor shall submit for MDT approval a traffic control plan that is sufficient to protect the traveling public and maintain traffic flow through the construction sites on state roadways." MDT was to

---

[1] American Traffic Safety Services Association, *see* https://www.atssa.com/

4

"[r]eview and approve the Developer/contractor's submittals related to the traffic control plan." The MOA specifically provided that the necessary road improvements to the Gore Hill Interchange were "a direct result of the Developer's proposed action…."

¶12    GFSG contracted with United Rentals to develop a traffic control plan. In September 2004, United Rentals formulated a plan for signage and submitted it to GFSG. GFSG, in turn, submitted the plan to the State of Montana for approval. The plan made general provisions for signage but no specific provision for flaggers. David Kelly reviewed and approved the plan. He testified that he found the plan sufficient to notify people coming off the interstate and frontage roads that they were coming into a construction zone. He also testified that he inspected the work on at least three occasions to look at drainage issues and the quality of some paving.

¶13    The accident occurred on May 11, 2005. GFSG's paving foreman, Doug Conley, had directed Davies to control traffic coming from the I-15 interchange area at the intersection of 31st Street Southwest and the Tri Hill Frontage Road. Davies was not a certified flagger. Conley did not rely on any traffic control plan; and indeed, did not know GFSG had asked anyone to develop a traffic control plan.

¶14    Tychsen was operating a Kenworth Supertrain, traveling north on Tri Hill Frontage Road. Tychsen came to a full stop at the intersection. Tychsen saw Davies as Davies stood behind construction candles closing off the eastbound land of 31st Street Southwest and leading into the single open lane that normally contained westbound traffic. Tychsen

(accessed Aug. 19, 2013).

5

attempted a broad right turn from Tri Hill Frontage Road onto 31st Street Southwest. Davies and Tychsen could see each other as Tychsen's truck passed. Davies waved Tychsen's truck by, then turned his back on Tychsen's moving vehicle. The truck struck Davies, knocking him to the ground and dragging him along the pavement. Davies sustained serious injuries.

¶15    Davies filed a negligence action in the Eighth Judicial District Court, Cascade County, against Irvin. Irvin answered denying negligence. Irvin filed a third-party complaint seeking contribution from the State, alleging the State negligently approved the traffic control plan. Irvin settled Davies' claims, which were dismissed from the case, leaving Irvin's third-party claims against the State. Irvin moved for summary judgment on the issue of the State's duty to Irvin and Davies. The District Court denied Irvin's motion, holding the State did not owe any duty to Irvin or Davies. Irvin moved for entry of judgment on the District Court's order denying its motion for summary judgment. The District Court entered judgment in favor of the State. Irvin appealed.

## STANDARD OF REVIEW

¶16    We review a district court's denial of summary judgment de novo. *Dubiel v. Mont. Dept. of Transp.*, 2012 MT 35, ¶ 10, 364 Mont. 175, 272 P.3d 66. Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3) (2013).

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of material fact do not exist,

6

the court must then determine whether the moving party is entitled to judgment as a matter of law.

*Beckman v. Butte-Silver Bow Co.*, 2000 MT 112, ¶ 11, 299 Mont. 389, 1 P.3d 348 (quoting

*Bruner v. Yellowstone Co.*, 272 Mont. 261, 264, 900 P.2d 901, 903 (1995)).

¶17     Ordinarily, questions of negligence are poorly suited to adjudication by summary judgment and are better left for jury determination. *Prindel v. Ravalli Co.*, 2006 MT 62, ¶ 20, 331 Mont. 338, 133 P.3d 189. However, the existence of a legal duty presents a question of law to be determined by the court. *State v. Butte-Silver Bow Co.*, 2009 MT 414, ¶ 20, 353 Mont. 497, 220 P.3d 1115.

¶18     The interpretation and construction of a statute is a matter of law. *In re J.D.N.*, 2008 MT 420, ¶ 8, 347 Mont. 368, 199 P.3d 189. A district court's interpretation and application of a statute are reviewed de novo. *J.D.N.*, ¶ 8.

## DISCUSSION

¶19     *1. Did the State owe a statutory, nondelegable duty to Irvin?*

¶20     Irvin argues on appeal that § 61-8-203, MCA (2003), imposed a statutory duty on the State to place and maintain traffic control devices on highways in conformance with State-issued standards; and that § 61-1-403, MCA (2003), provides a flagger is a traffic control device within the statute. Irvin argues this duty is nondelegable. Moreover, Irvin contends that the statute's purpose is to protect road workers, like Davies, and the traveling public, like Irvin.

7

¶21     The State counters that its statutory duty to place traffic control devices on highways is discretionary and delegable. It further asserts that a flagger is not a traffic control device within the statute. The State compares § 61-8-203, MCA (2003), with § 61-8-206, MCA (2003), to illustrate that it does not have the only authority to place traffic control devices on highways in the state. Indeed, § 61-8-314(4)(a), MCA (2003), authorizes a State, a local authority, a utility company or a private contractor to post speed limit signs—which are within the definition of a traffic control device—in work zones. A flagger, the State argues, is not a traffic control device for the purposes of § 61-8-203, MCA (2003), because flaggers are not included within the Manual on Uniform Traffic Control Device's (MUTCD) definition of traffic control device. Section 61-1-403, MCA (2003), defines "official traffic control devices" to include "flag person" only insofar as a flag person is a device "not inconsistent with" Title 61, it explains. Since Title 61's definition of a traffic control device refers to the MUTCD definition, which excludes "flag person," to include flag person in that definition would be inconsistent with Title 61. Further, because § 61-1-403, MCA (2003), speaks in general terms, whereas § 61-8-203, MCA (2003), is more specific, the latter should control. Finally, the State contends that the public duty doctrine precludes the State from having a duty to Davies because the State had no special relationship with Davies.

¶22     Irvin's reading of the applicable statutes requests we impose a nondelegable duty upon the State to police every construction project on highways within its jurisdiction to ensure that State-imposed safety standards are being followed. We decline to do so. Because we find the statutes do not impose the legal duty on the State Irvin asserts, we do

8

not reach the question of whether the statutes at issue are meant to protect Davies or Irvin from the type of harm that occurred.

¶23     Section 61-8-203, MCA (2003), provides as follows:

**Department of transportation to place traffic control devices on highways it maintains and approve traffic control devices on highways under its jurisdiction.** (1) The department of transportation shall place and maintain traffic control devices, conforming to its manual and specifications, upon all highways maintained by the department of transportation that the department considers necessary to carry out the provisions of this chapter and chapter 9 or to regulate, warn, or guide traffic.
        (2) A local authority or other entity may not place or maintain a traffic control device upon a highway under the jurisdiction of the department of transportation except with the department's permission.
        (3) The unauthorized erection of a sign, marker, emblem, or other traffic control device on a highway under the jurisdiction of the department of transportation by any other entity is a misdemeanor and is punishable as provided in 61-8-712.
        (4) The erection or maintenance of a sign, marker, emblem, or traffic control device on a highway under the jurisdiction of the department of transportation is subject to the rules and specifications that the department adopts and publishes in the interest of public safety and convenience.

¶24     Section 61-1-403, MCA (2003), defines "official traffic control devices" to mean:

[A]ll signs, signals, markings, and devices not inconsistent with this title, placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning, or guiding traffic. For the purpose of chapter 8, part 2, of this title, the term also includes "flag person" as defined in 61-1-411.

¶25     Section 61-1-411, MCA (2003), defines a "flag person" as:

[A]ny person who directs, controls, or alters the normal flow of vehicular traffic upon a street or highway as a result of a vehicular traffic hazard then present on that street or highway. This person, except a uniformed traffic enforcement officer exercising his duty as a result of a planned vehicular traffic hazard, shall be equipped as required by the rules of the Montana department of transportation.

9

¶26    When interpreting statutes, a court is bound by a statute's plain meaning and its task is to simply ascertain and declare what is in terms or substance contained therein, not to insert what has been omitted, or to omit what has been inserted. Section 1-2-101, MCA (2013). We first look to the plain meaning of the words a statute contains. *In re D.B.J.*, 2012 MT 220, ¶ 40, 366 Mont. 320, 286 P.3d 1201.

¶27    *a. The State's statutory duty.*

¶28    Section 61-8-203, MCA (2003), "Department of transportation to place traffic control devices on highways it maintains and approve traffic control devices on highways under its jurisdiction," provides two directions to MDT. MDT must both "place traffic control devices on highways it maintains" and "approve traffic control devices on highways under its jurisdiction." Section 61-8-203(1), MCA (2003), governs where the State is maintaining a highway. Sections 61-8-203(2)-(4), MCA (2003), apply where the State is not maintaining the highway, but the highway is under State jurisdiction. Where the State is not maintaining a highway, its duty is limited to approving traffic control devices on highways under its jurisdiction.

¶29    ""Maintenance" means the preservation of the entire highway, including surface, shoulders, roadsides, structures, and traffic control devices that are necessary for the safe and efficient use of the highway." Section 60-1-103(21), MCA (2003). "Preservation" is "keeping safe from harm; avoiding injury, destruction or decay….[and] always presupposes a real or existing danger." *Black's Law Dictionary* 1348 (4th ed., West 1968). Section 60-2-

10

203(1), MCA (2003), directs MDT to "maintain all public highways or portions of public highways that it maintained on July 1, 1976." Public highways include "(a) federal-aid highways; (b) state highways; (c) county roads; (d) city streets." Section 60-1-201(1), MCA (2003). The State can delegate maintenance duties to counties or municipalities but remains financially responsible for the work. Section 60-2-204, MCA (2003). In *Butte-Silver Bow Co.*, we observed that State retention of financial responsibility for a road project reflects "ownership and control." *Butte-Silver Bow Co.*, ¶¶ 20-21.

¶30    *i. The State's duty to place traffic control devices on highways it maintains.*

¶31    Here, § 61-8-203, MCA (2003), did not impose a duty on the State to place traffic control devices because the State was not "maintaining" the highway. The project's purpose was to facilitate access to a new travel station constructed for Flying J's financial benefit. No "real or existing danger" to the road surface, or need for "preservation," would have existed if Flying J had not constructed the travel plaza. The MOA provided that the necessary road improvements to the Gore Hill Interchange were "a direct result of the Developer's proposed action…." The travel plaza construction project did not constitute "maintenance."

¶32    The fact that the State did not retain financial responsibility for the project further reflects that this was not a maintenance project. Unlike in *Butte-Silver Bow Co.*, neither the State nor the County had retained financial responsibility for the project. Rather, Flying J contracted and paid for all of the highway roadwork for its own financial benefit.

11

¶33	The purpose of the project was not maintenance; and the State was not conducting, contracting, or paying for the work. Even though the Special Provisions provided the project was an "MDT project," in this context this characterization cannot be stretched beyond illustrating that the roadway was under State jurisdiction. This is consistent with the terms of the MOA itself, which characterized the road way as "under the authority" of MDT. The State did not have legal responsibility under § 61-8-203(1), MCA (2003), because the State was not "maintaining" the road.

¶34	*ii. The State's duty to approve traffic control devices on highways under its jurisdiction.*

¶35	Nor do the facts show the State failed to approve traffic control devices on a highway under its jurisdiction. Even though the classification of the highway on which the accident occurred remains in dispute, we assume it was under State jurisdiction. The characterization of the project as an "MDT project," or a project under MDT "authority," tends to show State jurisdiction. As the District Court observed, "it appears that the accident itself occurred on a state right of way." In addition, the statutes define "public highway" very broadly. *See* § 60-1-201(1), MCA (2003). Since MDT was not maintaining the highway, the MOA itself correctly articulated MDT's duty: "[R]eview and approve the Developer/contractor's submittals related to the traffic control plan…."

¶36	David Kelly reviewed and approved the traffic control plan in 2004. He testified that he found the plan sufficient to notify people coming off the interstate and frontage roads that they were coming into a construction zone. The State's duty ended there. GFSG submitted

12

no additional traffic control plans for the State's approval. The State's Special Provisions provided: "It is the Contractor's responsibility to be familiar with all MDT special provisions, standards, specifications, and construction requirements."

¶37   Further, GFSG was not complying with the 2004 traffic control plan when the accident occurred. Conley did not refer to or rely on any traffic control plan when he decided where to place the construction candles and where to locate the flagger stations.

¶38   Section 61-1-403, MCA (2003), unequivocally indicates that for the purposes of Title 8, section 2, a flagger is a traffic control device. We will not engage in gymnastics of interpretation to arrive at a different result.

¶39   Section 61-8-203, MCA (2003), as noted, requires the State to "*approve* traffic control devices on highways under its jurisdiction." (Emphasis added.) This requirement resumes the submission of a plan for approval that sets forth which traffic control devices are to be used. The MOA with the State required that the plan include the traffic control method. The only plan submitted to the State was the September 2004 plan for signage. It made no mention of flaggers. If GFSG wished the State to approve use of flaggers as traffic control devices, it should have included flaggers in the plan it submitted for the State's approval. The Special Provisions provided that Flying J was responsible for establishing a traffic control management plan including flagging, spacing and type of traffic control devices; providing traffic control in compliance with the MUTCD; and providing certified flaggers. It was GFSG's responsibility to ensure it operated the construction site in accordance with State standards; the State had no duty to supervise the site. No additional plan was submitted

13

detailing locations of the construction candles or of flagging stations. MDT cannot be held negligent for not reviewing what was not submitted.

¶40    *b. Whether the State's duty was nondelegable.*

¶41    We are not persuaded by the cases Irvin cites to suggest the State's duty is nondelegable. Neither the statutes nor binding precedent indicate that to the extent the State's duty to maintain safe roads includes placing traffic control devices in work zones, it is nondelegable. The State correctly directs our attention to statutes showing that other entities have statutory authority to place traffic control devices on highways in the state. *See* §§ 61-8-206, 61-8-314(4)(a), MCA (2003).

¶42    The cases Irvin cites to support its argument that a nondelegable duty applies here would not impose a duty broad enough to hold the State liable under these facts. Even where a nondelegable duty exists, as the court in *Harjes v. State of New York* suggested, the State "is not required to act as an insurer against all accidents…[and] is not obligated to employ a constant vigilance over its highway network, but only to pursue reasonably plausible measures." *Harjes v. State of New York*, 1 A.D.3d 1278, 1279-80 (2010). The court in *DiCapo v. City of Opelousas* found the State had a nondelegable duty in part because "[t]he trial judge properly concluded that there was no evidence at all on which the jury could find that the City of Opelousas had any legal responsibility for the maintenance of the sidewalk." *DiCapo v. City of Opelousas*, 736 So.2d 933, 936 (La. 1999).

¶43    Here, the State pursued reasonably plausible measures within the statutory requirements to ensure road safety when it approved the traffic control plan. It was not

14

required to monitor or police the construction site to make sure the plan was being followed. The District Court properly concluded that the State did not have legal responsibility for the road work at issue here.

¶44 *2. Did the State owe a common law duty to Irvin?*

¶45 The State has a duty to provide and maintain safe highways for the citizens of the state of Montana. *Brohman v. State*, 230 Mont. 198, 201-02, 749 P.2d 67, 70 (1988) (citing *State v. District Court of the Fourteenth Judicial District*, 175 Mont. 63, 67, 572 P.2d 201, 203 (1977)). In *District Court*, the issue was whether the State could maintain the defense of sovereign immunity in light of the Tort Claims Act. In that context, this Court held that "the Tort Claims Act attaches liability to the State in the same manner and to the same extent that liability attaches to a private person…Whenever and wherever it chooses to build highways it assumes the duty of building and maintaining them safely and is answerable if it fails to do so." *District Court*, 175 Mont. at 67, 572 P.2d at 203.

¶46 Since we conclude that this project is not a State maintenance project, we conclude the common-law duty from *Brohman* and *District Court* does not apply here. Just as Flying J will be responsible for maintaining its travel plaza, it is responsible for the road work that results directly from constructing the plaza.[2] The State's duties related to Flying J's work are set forth in the statutes, with which we have concluded the State complied.

---

[2] We observe that while GFSG must comply with the Traffic Control Plan and observe safety standards for the paving project, Flying J is principally responsible for the work associated with constructing its travel plaza. This is true even though the construction work affects a state highway. Flying J's responsibility displaces any

15

¶47    *3. Was the State vicariously liable for the torts of contractors working on this road project?*

¶48    The District Court did not address the issue of vicarious liability. Irvin argues that the State is vicariously liable for contractors' negligence because road construction work is inherently dangerous and the State owns the road where the accident occurred. Irvin, in arguing that vicarious liability should attach, relies on cases in which there was an employer-employee or contractor-subcontractor relationship. *See Beckman*, ¶ 12; *Ulmen v. Schwieger*, 92 Mont. 331, 352-53, 12 P.2d 856, 861-62 (1932). The State argues that for liability to attach there must be some contractual or agency relationship between the State and GFSG, relying primarily on *Paull v. Park Co.*, 2009 MT 321, 352 Mont. 465, 218 P.3d 1198.

¶49    Generally, employers are not liable for torts of their independent contractors. *Beckman*, ¶ 12. An exception to the general rule exists where the activity is inherently or intrinsically dangerous. *Paull*, ¶ 19 (citing *Beckman*, ¶ 12). In *Paull*, we held that a contractor is vicariously liable for injuries to others caused by a subcontractor's failure to take precautions to reduce the unreasonable risks associated with an inherently dangerous activity. *Paull*, ¶ 30. We also held that vicarious liability may attach where an agency relationship exists. *Paull*, ¶ 38. "Integral to any agency relationship are the elements of

---

potential for State liability under the theory of *respondeat superior* because Flying J is paying for, designing and contracting the project. In other words, to the extent *respondeat superior* allows the employer of a contractor or subcontractor to be held liable for the contractor or subcontractor's torts or negligence, Flying J bears that liability. But we need not reach the question of Flying J's liability here, because that question has not been presented for our review.

consent and control." *Wolfe v. Schulz Refrigeration*, 188 Mont. 511, 517, 614 P.2d 1015, 1018 (1979).

¶50 Here, the State was not GFSG's employer or principal. The State did not contract with GFSG for the road work. The State did not pay GFSG. The State exercised no supervision or control over the construction of the travel plaza and appurtenant paving project, beyond approving the traffic control plan and, potentially, three site visits. Irvin provides no authority on which to base vicarious liability where there is essentially no relationship between the State and the alleged tortfeasor. The State was not GFSG's employer; no contractor-subcontractor relationship existed between the State and GFSG; and GFSG was not acting as the State's agent. We need not inquire into whether flagging is inherently dangerous to conclude the State was not vicariously liable for GFSG's torts.

¶51 *4. Did the District Court err when it determined Irvin is not entitled to summary judgment?*

¶52 Montana Rule of Civil Procedure 56(c) provides in pertinent part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

¶53 We conclude that no genuine issue of material fact exists. Although the question of whether the section of 31st Street Southwest where the accident occurred is a State highway remains, it is not material. Even where the State delegates maintenance responsibilities to a city or municipality, it retains liability for injuries stemming from negligent maintenance.

*See generally Butte-Silver Bow Co.,* ¶ 20. Here, however, we have concluded no "maintenance" occurred; and the project was not under State or municipal control. Rather, we assume 31st Street Southwest is under MDT's jurisdiction and conclude MDT fulfilled its statutory and common law duties regarding traffic control.

¶54    Irvin is not entitled to judgment as a matter of law. The State had no statutory duty to place traffic control devices, including flaggers, on 31st Street Southwest. The only duty § 61-8-203 imposed was to "approve traffic control devices on highways under its jurisdiction." The State fulfilled this duty when it approved the traffic control plan. The State's common law duty to maintain the highways of the State does not apply because we have concluded the construction project at issue did not constitute "maintenance." Finally, vicarious liability is not appropriate here because the State had barely any relationship to the project beyond approving the traffic control plan. Irvin has failed to show it is entitled to judgment as a matter of law on the issue of the State's duty and the District Court did not err when it denied Irvin's motion for summary judgment and granted judgment in favor of the State.

¶55    Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ JIM RICE
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON