FILED

12/31/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0312

DA 23-0312

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 319

T.M.B., by and through DARCY SAUNDERS,
CAPITAL CITY CASE MANAGEMENT,
Guardian and Conservator,

      Plaintiff and Appellant,

v.

WEST MONT and STATE OF MONTANA,

      Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District, In and For the County of Lewis and Clark, Cause No. ADV-2020-1599 Honorable Mike Menahan, Presiding Judge |

COUNSEL OF RECORD:

    For Appellant:

        Linda M. Deola, Morrison, Sherwood, Wilson & Deola, PLLP, Helena, Montana

    For Appellees:

        Antonia P. Marra, Marra, Evenson & Levine, P.C., Great Falls, Montana (for West Mont)

        Susan Moriarity Miltko, Hannah I. Higgins, Williams Law Firm, P.C., Missoula, Montana (for State of Montana)

    For Amici Curiae Montana Trial Lawyers Association and Disability Rights Montana:

        John Amsden, Justin Stalpes, Sydney Best, Beck, Amsden & Stalpes, PLLC, Bozeman, Montana

Submitted on Briefs: July 31, 2024
Decided: December 31, 2024

Filed: _____
                          Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 After closing the Montana Developmental Center (MDC) in 2015, the Montana State Legislature enacted a statutory scheme providing a continuum of services for then-residents of MDC and all disabled persons, including authorizing the Department of Health and Human Services (DPHHS) to collaborate with nonprofit independent contractors to serve qualified individuals in community-based settings. West Mont is such an entity with which the State of Montana, through DPHHS, contracts to provide community-based services to disabled persons. In July 2019, T.M.B., a disabled woman living in a West Mont community group home pursuant to placement there by her guardian, was sexually assaulted by a West Mont employee. T.M.B. sued the State and West Mont to recover for her damages, alleging that both entities owed her a nondelegable duty of care. The District Court concluded that neither the State nor West Mont was vicariously liable under a nondelegable duty of care for the employee's criminal acts, and separately granted summary judgment to both Defendants, dismissing the case. T.M.B. appeals. We consider the following questions:

1. *Did the District Court err by concluding the State did not owe T.M.B. a nondelegable duty of care?*

2. *Did the District Court err by concluding West Mont did not owe T.M.B. a nondelegable duty of care?*

¶2 We affirm the District Court's decision as to the State, reverse as to West Mont, and remand for further proceedings consistent herewith.

3

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 West Mont is a nonprofit organization that provides services for developmentally disabled individuals in the greater Helena, Montana area, including vocational training and residential facilities. The State, through DPHHS, contracted with West Mont to provide such services (the "Contract"), and designated West Mont a Qualified Provider as necessary to participate in the State's Developmental Disabilities Program (DDP). The Contract between DPHHS and West Mont, the "Contractor," provides, in pertinent part:

> The purpose of this contract is to obtain developmental disabilities services for those of Montana's citizens with developmental disabilities who are eligible for one or more of the developmental disabilities community services administered by [DPHHS]
>
> . . .
>
> The Contractor is authorized by this Contract to make available the following developmental disabilities community services in accordance with this Contract
>
> . . .
>
> The Contractor must comply with all state and federal laws, rules, regulations, ordinances, and executive orders applicable to the performance of the Services under this Contract
>
> . . .
>
> The Contractor represents and warrants that it is an independent contractor and that its employees, agents and any subcontractors are not employees of the State of Montana. The Contractor may not in any manner represent or maintain the appearance of being employees of the State of Montana.
>
> . . .
>
> The Contractor . . . must indemnify . . . the State of Montana against any allegations of liability . . . caused by or arising out of Contractor's performance of services under this Contract.

¶4 As a Qualified Provider, West Mont is obligated to comply with §§ 37.34.701 through 702, 706, Admin. R. M., as well as the applicable state law as outlined in the

4

Montana Developmental Disabilities and Facilities Act of 1974 (the Act) (codified at § 53-20-101, MCA, et seq.). The purpose of the Act is to, in part:

(1) secure for each person who may be a person with developmental disabilities such treatment and habilitation as will be suited to the needs of the person and to assure that such treatment and habilitation are skillfully and humanely administered with full respect for the person's dignity and personal integrity; [and]

(2) accomplish this goal whenever possible in a community-based setting.

Section 53-20-101(1), (2), MCA. DPHHS regularly audits West Mont to ensure its facilities and personnel satisfy state standards and are properly licensed, but the Department is not otherwise involved with the day-to-day operations of West Mont. *See* § 53-20-305, MCA.

¶5 West Mont is required, by contract and regulation, *see* § 37.34.1501, Admin. R. M., to comply with DPHHS' Developmental Disabilities Program Incident Management Procedures Manual.[1] The Manual primarily addresses procedures to be followed after a defined incident occurs in the course of delivering DDP-funded services, but also states as follows:

**Incident Management Principles**

People should have a quality of life that is free of abuse, neglect, and exploitation. A provider agency's incident management system must emphasize prevention and staff involvement in order to provide safe environments for the people they serve.

. . .

---

[1] The Manual was produced in discovery by West Mont in response to Plaintiff's request for West Mont to produce a copy of "all contracts and agreements that West Mont has entered into with the State of Montana . . . for providing developmental disability services."

5

**Section 2:  PROVIDER REQUIREMENTS**

Provider agencies must have policies and procedures to accomplish the following:

1.  Protection from harm
--Take immediate action to either remove persons from a harmful situation or to otherwise protect persons from harm.

--Provide prompt staff intervention when knowledge of harm, or the potential for harm, occurs.

¶6     T.M.B. was born in 1964 with Down syndrome.  T.M.B. is visually and hearing impaired, and essentially non-verbal.  She is able to communicate with hand signs.  In 1969, T.M.B. was placed at the Boulder River School and Hospital, which later became the MDC.  After this placement, T.M.B. lost all contact with her birth family.  In 1987, after becoming ineligible for further foster care services, T.M.B. began living in a West Mont group home and receiving care, with medical services funded through Medicaid.  In 2004, West Mont identified a need to formalize authority for decisions regarding T.M.B.'s care.  Capital City Case Management was appointed as T.M.B.'s temporary and then permanent medical guardian, and has acted on T.M.B.'s behalf since then.  Capital City Case Management was subsequently purchased by Cottonwood Case Management (CCM).  Darcy Saunders (Saunders), chief executive officer of CCM, or her designee has at all relevant times attended T.M.B.'s annual Personal Support Plan (PSP) meetings, and participated in the development of T.M.B.'s PSP.[2]  T.M.B.'s continued placement at West

---

[2] A "Personal Support Plan" is defined in the Contract as "the plan of care for members.  The PSP is developed by the member and his/her support team and addresses the assessed health, safety, and habilitation needs, indicating the member's choices and preferences in how to address those

Mont has been approved by Saunders pursuant to an annual election and execution by Saunders or her designee of a Freedom of Choice and Consent Form for T.M.B. The stated purpose of the Form is to ensure that all DDP waiver participants understand their right to:

1. Choice of waiver services, including self-direction
2. Choice of providers of DDP funded services
3. Choice of filing a fair hearing request
4. Choice between waiver services and Intermediate Care Facility for individuals with intellectual disabilities . . . [along with] the choice of service provider and choice of services subject to demonstration of assessed need.

The Form stated on behalf of T.M.B. that she "freely choose to . . . receive services in the community via the HCBS DD Medicaid Waiver" and to "Receive services from [West Mont]."[3]

¶7 T.M.B. has never been subject to a court-ordered commitment to a residential facility at West Mont or elsewhere as a designated "seriously developmentally disabled" person. *See* § 53-20-102(14), (19), MCA (a seriously developmentally disabled person means a person who "cannot be safely and effectively habilitated through voluntary use of community-based services because of behaviors that pose an imminent risk of serious harm to self or others"). Produced in discovery and not disputed is a Social History of T.M.B.

---

needs." A "member" is an "[i]ndividual receiving a service administered by the Developmental Disabilities Program."

[3] CCM was appointed as permanent full guardian and conservator of T.M.B. in July 2021, after the occurrence of the events that are the subject of this litigation. T.M.B. offers a brief argument that the original medical guardianship under which CCM continued T.M.B.'s placement at West Mont was limited in scope and thus insufficient to exercise custody of T.M.B. for purposes of analyzing application of § 214 of Restatement (Second) of Agency. However, it is clear that T.M.B.'s continued stay at West Mont was long effectuated by exercise of apparent authority from the first guardianship, and not by action of the government or others.

dated February 10, 2010, which describes T.M.B. as "vulnerable in all areas due to her disabilities. She requires 24 hours of supervision to keep her safe and healthy."

¶8 In the summer of 2019, T.M.B. was living in one of 12 community-based facilities operated by West Mont in the Helena area, the Hillside Group Home (group home). West Mont employed certified Direct Support Professionals (DSP) to provide care for the "clients" living in the group home. The DSP job duties were described as follows:

> Provides and maintains a safe, clean, and comfortable environment for clients while following the organization's policies and procedures. Provides clients with assistance and supervision needed to perform daily living tasks, and/or vocational skills. Observes, reports, and documents client physical conditions, skill training, and behaviors.

¶9 Around 1:00 a.m., on July 13, 2019, Zane Frisbie (Frisbie), a DSP employed by West Mont, raped T.M.B. in her room at the group home. A West Mont supervisor conducting nightly rounds caught Frisbie in the act and called police. Frisbie was arrested and charged with Aggravated Sexual Intercourse without Consent, and was discharged from his employment with West Mont. Upon entry of an Alford plea, Frisbie was sentenced to a lengthy prison term. An investigation by the Department conducted pursuant to the Incident Management Procedures Manual concluded that West Mont had followed all procedures in Frisbie's hiring and training, including conducting a background check, and had followed all policies and procedures in supervising clients and staff.

¶10 T.M.B. filed suit against West Mont in September 2020, alleging inadequate supervision of Frisbie and negligence in fulfilling a nondelegable duty to protect T.M.B. from harm. Thereafter, T.M.B. twice amended her complaint, abandoning the negligent supervision claim against West Mont, but adding claims against the State, alleging that

8

both the State and West Mont had breached a nondelegable duty of care to T.M.B., and that the State had "negligently oversaw and supervised West Mont." After discovery, all parties moved for summary judgment on liability, and the District Court received argument. Stating that "[t]he parties agree there are no material issues of fact," the District Court analyzed T.M.B.'s nondelegable duty claims against the State and West Mont under Restatement (Second) of Agency § 214, which it noted had been adopted by this Court in *Paull v. Park County*, 2009 MT 321, ¶ 37, 352 Mont. 465, 218 P.3d 1198. For that analysis, the District Court explained that "the relevant question is not whether an action was within the scope of employment but rather whether the nondelegable duty existed" under the circumstances of the case, observing that "the contours of the [nondelegable duty] doctrine are not yet well defined as there is limited case law on the matter." Reasoning that the State had satisfied its statutory obligation to create the DDP program, and that its contract with West Mont met the statutory requirements for the Department to provide minimum standards for its programs, the District Court concluded that "[t]he State's obligation to make services available does not go so far as to create a nondelegable duty between the State and individuals who voluntarily participate in the public benefits program," distinguishing the relationship here from the "close and continuous" relationship in *Paull*, where the plaintiff "had no choice but to place himself in the care of the state's agent," because he was "under state authority and supervision." The District Court thus granted summary judgment on T.M.B.'s claims against the State. T.M.B. filed a writ requesting supervisory control over this decision, which this Court denied, noting an adequate remedy of appeal. *T.M.B. v. Mont. First Jud. Dist. Court*, No. OP 22-0175, 409 Mont. 555, 512

9

P.3d 1175 (May 10, 2022). Thereafter, T.M.B. sought to amend her complaint a third time to add additional counts of negligence against West Mont, which was denied. T.M.B. and West Mont also stipulated to dismissal of T.M.B.'s claim regarding an alleged medication error. Regarding West Mont's motion for summary judgment on T.M.B.'s claim that West Mont breached a nondelegable duty, the District Court reasoned that "there is no statute or administrative rule which unequivocally proclaims" that state contractors operating "homes for persons with developmental disabilities have a duty to protect residents," and that the Title 53 provisions cited by T.M.B. offered "little support . . . for T.M.B.'s claim regarding the nondelegable duty given the facts here," distinguishing the relationships for which courts found a nondelegable duty in *Paull* and *Smith v. Ripley*, 446 F. Supp. 3d 683 (D. Mont. 2020). The court thus entered summary judgment for West Mont on T.M.B.'s remaining claim.

¶11 T.M.B. appeals from both summary judgment orders.

## STANDARD OF REVIEW

¶12 We review a District Court's ruling on summary judgment de novo, applying the criteria set forth in M. R. Civ. P. 56. *Paull*, ¶ 17. Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3).

## DISCUSSION

¶13 "'Vicarious liability is not based upon the defendant's own fault. Rather, it is based upon the principle that he must bear legal responsibility for another's wrong.'" *Smith*, 446

10

F. Supp. 3d at 686 (citing Dan B. Dobbs et al., *Dobbs' Law of Torts* § 425 (2d ed.)); *see also* 1 Comparative Negligence § 15.01 (2024) (common law recognizes the principle of vicarious liability, "wherein a nonnegligent party is held liable for the acts of another based on the relationship between them"). In the employer-employee context, "the common law doctrine of respondeat superior imposes vicarious liability on employers for the tortious conduct of employees committed while acting within the scope of their employment." *Brenden v. City of Billings*, 2020 MT 72, ¶ 13, 399 Mont. 352, 470 P.3d 168 (citing *Kornec v. Mike Horse Mining & Milling Co.*, 120 Mont. 1, 7-8, 180 P.2d 252, 256 (1947)); *L.B. v. United States*, 2022 MT 166, ¶ 9, 409 Mont. 505, 515 P.3d 818. Like private parties, governmental entities can be subject to vicarious liability. *Brenden*, ¶ 13, n.2. "For purposes of respondeat superior, a tortious act occurred within the scope of employment if the act was either expressly or implicitly authorized by the employer or was incidental to an expressly or implicitly authorized act." *Brenden*, ¶ 14. "Identifying whether a tortious act falls outside an employee's scope of employment is necessarily fact-intensive." *L.B.*, ¶ 14; *see also Brenden*, ¶ 18 ("The question of whether an employee was at least partially motivated by an intent or purpose to directly or indirectly further the employer's interest is a question of fact for consideration under the totality of the circumstances."). Further definitions and rules apply to this inquiry. *See Brenden*, ¶¶ 15-18 (involving a city supervisor) and *L.B.*, ¶¶ 9-17 (involving a federal law enforcement officer). We have also adopted a non-dispositive listing of factors from the Restatement (Second) of Agency § 229, entitled "Kind of Conduct Within Scope of Employment," for consideration "in determining the scope of employment." *L.B.*, ¶ 15.

11

¶14 However, we need not conduct a scope-of-employment analysis here because that respondeat superior issue is not presented in this litigation, despite being briefly referenced by T.M.B. in her appellate briefing. T.M.B.'s Second Amended Complaint contained allegations framed in three counts, including a count of negligence against West Mont for breaching a nondelegable duty, a count of negligence against the State for breaching a nondelegable duty, and a count of general negligence against the State for "negligently over[seeing] and super[vising] West Mont" in West Mont's "delivery of developmental disabilities services and operation of its group homes." The alleged facts of the Second Amended Complaint are likewise premised upon the State and West Mont owing a nondelegable duty to T.M.B. As West Mont notes, during the summary judgment hearing, T.M.B.'s counsel acknowledged that "[o]ur case is not based upon respondeat superior, and the nondelegable duty is an exception to that rule, and the exception requires that there be a statutory duty to that person and that there be a continuous relationship." Given T.M.B.'s pleadings and argument, the District Court accordingly framed its analysis, explaining that "T.M.B. brings her claim under the theory West Mont had a nondelegable duty to her and therefore is liable for the criminal act of its employee. . . . Thus, if West Mont had a nondelegable duty to T.M.B., whether its employee's criminal actions were in the scope of his employment or not is irrelevant." T.M.B. states in her appellate briefing that she also had "asserted that West Mont could be responsible for Frisbie's rape if his conduct was determined to be within the scope of employment," and faults the District Court for failing to address this issue. However, to the contrary, T.M.B. did not plead a scope-of-employment claim and specifically disclaimed that position during summary

12

judgment argument, leading the District Court to properly conclude that it had addressed the "only issue remaining before the Court." Likewise, T.M.B.'s pled claim against the State in general negligence for failing to oversee West Mont was not separately developed in the summary judgment record nor argued, was not separately addressed by the District Court, and is not developed in the appellate briefing. Consequently, we do not further address either T.M.B.'s scope-of-employment argument offered against West Mont nor her general negligence claim pled against the State.[4]

¶15    That leaves T.M.B.'s negligence claims premised upon both the State and West Mont owing her a nondelegable duty, which is the primary focus of the appellate briefing from the parties and from Amici Disability Rights Montana and Montana Trial Lawyers Association. "[A] nondelegable duty is an affirmative obligation to ensure the protection of the person to whom the duty runs." *Smith*, 446 F. Supp. 3d at 688 (citing *Meyer v. Holley*, 537 U.S. 280, 290, 123 S. Ct. 824, 831 (2003)). "As such, a nondelegable duty 'go[es] further' than other vicarious liability principles—like respondeat superior—by creating liability 'although [the principal] has himself done everything that could reasonably be required of him . . . and irrespective of whether the agent was acting with or

---

[4] Based upon the parties' briefing and argument, the District Court stated that "[t]he parties agree there are no material issues of fact." If that is correct, and a scope-of-employment issue remained, the undisputed record could render the usual issue of fact "one of law, however, when it appears that the given deviation [by the employee] was made for the purpose of doing something which had no connection with the servant's duty." *Smith*, 446 F. Supp. 3d at 687 (citing *Hoffman v. Roehl*, 203 P. 349, 350, 61 Mont. 290, 299 (1921)). *Smith* held that, "[b]ecause the deviation here—rape—was made for the purpose of doing something which had no connection with Ripley's job, the Court finds that Ripley acted outside the scope of his employment." *Smith*, 446 F. Supp. 3d at 688.

without authority.'" *Smith*, 446 F. Supp. 3d at 688 (citing *Meyer*, 537 U.S. at 290). Set forth in the Restatement (Second) of Agency, as crafted in 1958:

> A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person *is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.*

Restatement (Second) of Agency § 214 (Am. L. Inst. 1958) (emphasis added). After declining to adopt this provision in *Maguire v. State of Montana*, 254 Mont. 178, 835 P.2d 755 (1992), we later did so in *Paull*. *See Paull*, ¶ 37 ("We adopt Restatement (Second) Agency, § 214, as an appropriate statement of the law in Montana."); *see also L.B.*, ¶ 24 ("we adopted the Restatement (Second) of Agency, § 214, without limitation . . .").

¶16 Thus, while employers are generally not responsible for their employees' negligent or criminal acts performed *outside* the scope of their employment, *see Maguire*, 254 Mont. at 183, 835 P.2d at 758, and, similarly, employers are generally not liable for the torts of their independent contractors, *see Beckman v. Butte-Silver Bow County*, 2000 MT 112, ¶ 12, 299 Mont. 389, 1 P.3d 348, § 214, including its text and comments, explains that "by entering into certain relations with others, a person may become responsible for harm caused to them by conduct of his agents or servants *not within* the scope of employment." Restatement (Second) of Agency § 214, cmt. a. (Emphasis added.) As the comments to § 214 further explain:

> A master or principal may be in such relation to another that he has a duty to protect, or to see that due care is used to protect, such other from harm although not caused by an enterprise which has been initiated by the master or by things owned or possessed by him . . . the fact that the one to whom the

14

performance is delegated acts for his own purposes and with no intent to benefit the principal or master is immaterial.

Restatement (Second) of Agency § 214, cmt. e. Thus, liability may be imputed to a principal who has a nondelegable duty to protect a third party from harm and delegates that duty to another, but that delegate's acts or omissions cause harm to the third party who the principal has a duty to protect.

¶17 T.M.B. emphasizes our adoption of § 214 "without limitation," *L.B.*, ¶ 24; *Smith*, 446 F. Supp. 3d at 690, and argues the District Court failed to understand that the nondelegable duty doctrine under § 214 extended beyond the inherently dangerous activity exception. However, the District Court's analysis did not limit § 214's application to inherently dangerous activities, stating more generally that "Montana recognizes an exception to [the independent contractor rule] when a principal owes a nondelegable duty to protect another from harm caused by the principal's agent," and citing *Paull*. The District Court simply recognized that general adoption of § 214 did not compel a conclusion that employers have a nondelegable duty in all circumstances, noting that a court "still has the preliminary task of determining whether a nondelegable duty exist[s] *under the facts of this case*," (emphasis in original), and that "it is first necessary to determine the source" of an asserted nondelegable duty. Comment e of § 214 advises that "[t]his duty may be created by contract, as where one agrees to protect another, or may be imposed by law as incident to a relation voluntarily entered into, as the relation of carrier and passenger, or by statute," while also acknowledging that a listing of "the situations in which a duty of this sort exists and of the limits of such duty is beyond the scope of the

15

Restatement of this Subject." Restatement (Second) of Agency § 214, cmt. e. That task remains with the courts. *See TCF Enters., Inc. v. Rames, Inc.*, 2024 MT 38, ¶ 20, 415 Mont. 306, 544 P.3d 206 ("The existence of a legal duty is a question of law to be determined by the court.") (citation omitted). Thus, the determination of the existence of a nondelegable duty involves an analysis of the nature of the relationship that was formed, assessing whether a principal is "*in such relation* to another that he has a duty to protect, or to see that due care is used to protect, such other from harm . . ." Restatement (Second) of Agency § 214, cmt. e. (Emphasis added.) "By contract . . . or by entering into *certain relations* with others, a person may become responsible for harm caused to them by conduct of his agents or servants not within the scope of employment; the extent of this liability depends upon the duty assumed." Restatement (Second) of Agency § 214, cmt. a. (Emphasis added.)

¶18 Montana courts have been faced with application of § 214 in the context of various relationships. In *Maguire*, a disabled resident of MDC was raped by an MDC (State) employee, resulting in her pregnancy. *Maguire*, 254 Mont. at 181, 835 P.2d at 757. Finding "this rape was outside the scope of [the employee's] employment," we declined to extend the nondelegable duty exception to the respondeat superior doctrine unless the subject matter was inherently dangerous. *Maguire*, 254 Mont. at 183-84, 835 P.2d at 758-59. The Court reasoned, over a dissent, that such a significant departure from the respondeat superior doctrine would be "best left to the legislature." *Maguire*, 254 Mont. at 185, 835 P.2d at 759. In the succeeding decades, the Legislature has not acted upon the particular issue identified in *Maguire*, nor responded to later court decisions that have

16

addressed nondelegable duty, adopted § 214, and made application of that Restatement provision.

¶19 In *Beckman*, the plaintiff was employed by a company that had contracted with Butte-Silver Bow County to excavate and construct a water pipeline when the trench in which he was working collapsed. This Court determined the trenching operation in which the plaintiff was engaged was inherently dangerous such that the county could be held liable under an exception to the general rule limiting liability for acts or omissions committed by independent contractors, pursuant to the Restatement (Second) of Torts. *Beckman*, ¶ 28. We described the exceptions to the general rule protecting principals from liability arising from acts of independent contractors as follows: "(1) where there is a nondelegable duty based on a contract; (2) where the activity is inherently or intrinsically dangerous; and (3) where the general contractor negligently exercises control reserved over a subcontractor's work." *Beckman*, ¶ 12.

¶20 Applying *Beckman*, we first held in *Paull* that transporting prisoners was an inherently dangerous activity, and that the county, by contracting for such services with transportation company AEI, could "be held vicariously liable for injuries caused by an independent contractor" providing transportation to inmates. *Paull*, ¶¶ 22, 29 ("Long distance prisoner transportation, like the trenching in *Beckman*, is an inherently dangerous activity as a matter of law."). Then, turning to the State's responsibility, we discussed the nature of the legal relationship between the State of Montana and AEI, an independent transport contractor, and the State of Montana and Paull, a Montana probationer who was under supervision while living in Florida, as approved by the State, pursuant to the

17

Interstate Compact for Adult Offender Supervision, § 46-23-1115, MCA (Compact). *Paull*, ¶ 34. The Court explained that the Compact provided for the State's responsibility for interstate probationers. *Paull*, ¶ 34. As for AEI, it "had no independent authority to confine Paull and transport him in shackles from Florida to Montana absent authority from the State of Montana to do so," and therefore was an agent of the State. *Paull*, ¶¶ 32, 36. Regarding Paull, the Court determined that "Paull was in a continuing relationship with the State of Montana during the time it chose to return him from Florida to face proceedings in the courts of this State," explaining:

> It was the State that wanted Paull returned to Montana to answer to its process. Paull was under State authority and supervision. It was the State that caused him to be arrested in Florida and to be held 'for Montana.' Paull was Montana's prisoner at least from the time he was picked up by AEI from the arresting law enforcement authorities in Florida. No contractor-independent contractor relationship between the State and AEI is alleged or shown in the record. AEI was acting as the State's agent in transporting Paull.

*Paull*, ¶ 36. Upon this recognition that AEI was acting as the State's agent, that the State had a continuing custodial relationship with probationer Paull, and that the Compact imposed responsibility upon the State for safe interstate transport of probationers, the Court adopted § 214 "as an appropriate statement of the law in Montana," and held that the State had a nondelegable duty to Paull pursuant thereto, explaining: "[This] does not mean that the State is strictly liable for any injury that results from prisoner transportation regardless of fault. It does mean, however, that if the State chooses to transport prisoners by allowing other entities to do the work, it may be held liable for the tortious acts or omissions of its agents undertaking the transportation." *Paull*, ¶ 38; *see also Stricker v. Blaine County*,

18

2019 MT 280, ¶ 18, 398 Mont. 43, 453 P.3d 897 ("The tests for determining whether a duty is non-delegable to third parties are found under the analyses enumerated in *Beckman* and *Paull*.").

¶21     In *Shepherd v. Amtrak*, No. CV 17-40-GF-BMM, 2018 U.S. Dist. LEXIS 226726 (U.S. Dist. Mont.), the U.S. District Court held that, under § 214, the defendant train operator owed a nondelegable duty to a passenger for the sexual assault of the passenger by an employee, reasoning:

> Amtrak, as a common carrier, owed Shepherd a nondelegable duty to use the utmost care and diligence to ensure her safe carriage.  Amtrak committed the performance of this duty of care to its employee Pinner.  Pinner breached Amtrak's duty of care when he assaulted Shepherd.  Amtrak is therefore liable under § 214 for all of the harm suffered by Shepherd as a result of the sexual assault.

*Shepherd v. Amtrak*, at *5.[5]

¶22     In *Smith*, the plaintiff was a respondent and parent in a child protection proceeding initiated by the State that led to her stipulating to the State's legal custody of her children.  Defendant Ripley was a child protection specialist, an employee of the State, assigned to Smith's case and, as such, controlled Smith's contact with her children.  While Ripley was at Smith's house to collect case-related paperwork, he raped the plaintiff.  Plaintiff brought

---

[5] Judge Morris cited § 69-11-107, MCA to support the long-established principle that common carriers like Amtrak owe a duty of care to their passengers.  In 2023, the Montana State Legislature repealed this statute, but expressed its intention not to absolve common carriers of their heightened duty, stating: "There is a substantial body of common law or judicial precedent built around common carriers.  That common law renders parts of chapter 11 redundant . . . sections of chapter 11 and the duty of care in § 69-11-107 merely declare the common law duty of care that existed for many years before the statute.  This common law would remain if chapter 11 is repealed." H.B. 52 (Session Laws, 2023) House, Energy, Tech., and Fed. Rel. Comm. Meeting (Jan. 9, 2023).

19

suit, alleging state-law claims but also a Section 1983 claim for which the State invoked federal jurisdiction. Conducting an *Erie* analysis of Montana law,[6] the U.S. District Court determined that Ripley was the State's agent. It then cited the Montana child abuse and neglect statutes to demonstrate "the State's responsibility for the children and families" that are brought within its jurisdiction as a result of initiating abuse and neglect proceedings. *Smith*, 446 F. Supp. 3d at 691. Finally, the U.S. District Court reasoned that, "analogous to the probationer in *Paull*, [the plaintiff] was in a continuing relationship with the State after it removed her children from her home and legal custody," and that "[the plaintiff] was working to complete a State-imposed treatment plan." *Smith*, 446 F. Supp. 3d at 691. On these grounds, the U.S. District Court concluded the State "had a nondelegable duty of reasonable care to [the plaintiff]" under § 214. *Smith*, 446 F. Supp. 3d at 691.

   1. *T.M.B.'s nondelegable duty claim against the State.*

¶23   West Mont is an independent contractor with the State. T.M.B. does not premise her claim against the State on an exception to the general rule that a principal is not liable for torts committed by an independent contractor, as those exceptions are set forth in *Beckman*. Rather, the sole basis of her claim is that the State owes her a nondelegable duty in the same way that it owed a nondelegable duty to the probationer in *Paull*, on the basis of the statutes establishing the system of care in which T.M.B. participated, and pursuant to § 214. However, we disagree with T.M.B.'s position that the circumstances here are

---

[6] *See Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938).

similar to those in *Paull*, or that the statutes establish a nondelegable duty on the part of the State.

¶24 Sections 53-20-101, et seq., MCA, define and distinguish "community-based facilities" from "residential facilities." Residential facilities are restricted to placement of "seriously developmentally disabled" individuals who are "committed" to the facility upon the State's petition for judicial intervention. Sections 53-20-102(14), (15), (19), 53-20-125, MCA. A "seriously developmentally disabled" person is one who "(a) has a developmental disability; (b) is impaired in cognitive functioning; and (c) *cannot be safely and effectively habilitated through voluntary use of community-based services* because of behaviors that pose an imminent risk of serious harm to self or others." Section 53-20-102(19), MCA (emphasis added). The statutes governing the commitment, housing, and treatment of seriously developmentally disabled persons are extensive, and require due process to ensure the protection of rights of those persons committed to residential facilities. Sections 53-20-121 through 165, MCA.

¶25 "Voluntary use" community-based facilities, on the other hand, are those "that are available for the evaluation, treatment, and habilitation of persons with developmental disabilities in a community setting." Section 53-20-102(6), (10), MCA. In conjunction with the Legislature's determination to close MDC, the State is required to make community-based services "available" for developmentally disabled persons. Section 53-20-102(6), MCA.[7] Section 53-20-101(1), (2), MCA, expresses the Legislature's intent

_____

[7] Commitments to MDC were statutorily prohibited after December 31, 2016. *See* § 53-20-125(12)(b), MCA.

21

to assure that the "treatment and habilitation" of developmentally disabled persons are "skillfully and humanely administered." "Habilitation" is "the process by which a person who has a developmental disability is assisted in acquiring and maintaining those life skills that enable the person to cope more effectively with personal needs and the demands of the environment and in raising the level of the person's physical, mental, and social efficiency." Section 53-20-102(10), MCA. To accomplish these purposes and recognizing "the desirability of meeting these needs on a community level," the Legislature established a "community home program" for persons with developmental disabilities "to provide such homes through local nonprofit corporations." Section 53-20-301, MCA. Importantly, and consistent with the requirements for commitment of seriously developmentally disabled persons, *see* § 53-20-102(19), MCA, court-ordered placement of a seriously developmentally disabled person into a community-based facility is not statutorily permitted. Section 53-20-125, MCA. These community-based treatment provisions do not place occupants within the direct care or custody of the State.

¶26 T.M.B. resided in a West Mont community-based home for many years, but was never court-ordered to reside there, nor could she have been. T.M.B. was not seriously developmentally disabled, which would have made her ineligible to participate in West Mont's community-based service programs, and was never subject to judicial commitment proceedings. Thus, T.M.B. was only voluntarily admitted to West Mont's group home, never committed. Instead, T.M.B.'s care was determined by a court-appointed guardian, who made regular decisions about T.M.B.'s placement and care. The Freedom of Choice and Consent Forms signed by Saunders or her designee as T.M.B.'s guardian indicate that

22

T.M.B. was the ward of CCM, that T.M.B. had the ability to self-direct her care using a variety of providers, and that she freely chose to receive services from West Mont, without being compelled to do so by the State. Guardians and conservators act on behalf of the ward, not the State. Sections 72-5-101(5), 72-1-103(8), 72-5-306, MCA. That T.M.B. was a voluntary recipient of state-sponsored services does not equate to a continuing relationship with the State of a supervisory or custodial nature.

¶27 The Contract between the State and West Mont explicitly defines the roles of the parties, with West Mont representing and warranting that it was an independent contractor and that its employees, agents and any subcontractors were not employees of the State, nor would represent themselves to be. The Contract requires West Mont to provide specified developmental disability services under minimum requirements set by the State for Montana citizens who are eligible and requires West Mont to indemnify the State for any allegations of liability "caused by or arising out of Contractor's performance of services under this Contract." As the District Court found, the Contract satisfied the State's statutory obligations to make community-based services available through nonprofit corporations, specifically to satisfy the statutory directive to accomplish the delivery of services whenever possible in a community-based setting. The State, through DPHHS, identified West Mont as a Qualified Provider, provided funding for West Mont's services, and ensured proper licensing and training had occurred. The State had no involvement in West Mont's day-to-day operations and provision of services, beyond the contractual obligations for auditing, licensing, and oversight of the expenditure of Medicaid funds.

¶28 Thus, the State did not have a close, continuing relationship with T.M.B., either by legal custody or control, or by contractual obligation. T.M.B. lived at West Mont by virtue of her own choosing, through the decisions of her guardian. The record reflects that T.M.B. had State caseworkers over the years who ensured she was receiving elected services, but no indication is given that caseworkers participated in or were responsible for delivery of T.M.B.'s care. The State exercised no control over her choices.

¶29 The State had no relationship with Frisbie. His selection and supervision were the responsibility of West Mont, for which the State gave no input or consent. The State exercised no control over Frisbie. While vicarious liability may attach where an agency relationship exists, "[i]ntegral to any agency relationship are the elements of consent and control." *Dick Irvin, Inc. v. State*, 2013 MT 272, ¶ 49, 372 Mont. 58, 310 P.3d 524; *see Paull*, ¶ 33 ("Without some actual or apparent authority derived from the State, AEI had no basis for shackling Paull, confining him, and transporting him across the county."). Frisbie did not act on the basis of actual or apparent authority from the State, and was not the State's agent.

¶30 The facts here thus present a stark departure from those in *Paull*, where the State initiated Paull's return to the state, exercised continuing supervision over his probation and person, was statutorily obligated to properly provide interstate transport, and delegated authority for AEI to take physical custody and control of Paull for his transport. We thus conclude the State did not have a nondelegable duty pursuant to the assessment of the State's role and relationship as analyzed under § 214.

24

¶31 The Concurring and Dissenting Opinion articulates arguments in favor of imposing a nondelegable duty upon the State. We recognize that a court's duty determination is a broad inquiry that includes consideration of whether "such duty and liability comports with public policy under those circumstances," and the parties have offered broad arguments, including about public policy. *Md. Cas. Co. v. Asbestos Claims Court*, 2020 MT 70, ¶ 27, 399 Mont. 279, 460 P.3d 882. However, "there is generally no common law duty to protect others from risks of harm directly caused or created by third parties unless a qualifying special relationship or affirmative undertaking existed or occurred under the circumstances at issue." *Md. Cas. Co.*, ¶ 28. Similarly, § 214 has been applied in the context of close relationships, such as the custodial control exercised by the State in *Paull*. *Paull*, ¶ 36. Here, T.M.B.'s placement at West Mont has long been a choice effectuated by her guardian, not mandated by the State, and is considered by the statutes to be a "voluntary use" of community facilities, in contrast to the judicial commitment of a seriously developmentally disabled person. Section 53-20-102(19), MCA. She is not under a commitment to the facility. Thus, we affirm the District Court's holding as to the State.

*2. T.M.B.'s nondelegable duty claim against West Mont.*

¶32 T.M.B. contends West Mont breached a nondelegable duty by failing to ensure she received skillful and humane treatment with full respect for her dignity and personal integrity. *See* § 53-20-101(1), MCA. She takes issue with the District Court's reasoning that "there is no statute or administrative rule which unequivocally proclaims, 'State contractors operating community homes for persons with developmental disabilities have a duty to protect residents.'" West Mont argues that it was merely a service provider for

25

T.M.B., and that it should not be held liable for the criminal actions of its employee when it was not negligent in the hiring or supervision of that employee. However, we conclude that the relationship voluntarily entered into between T.M.B. and West Mont, as made apparent in the record, is one that gives rise to a nondelegable duty under § 214.

¶33 Obviously, the same statutory and regulatory structure governing the provision of community services to and operation of community facilities for developmentally disabled persons, discussed above as applicable to the State, also applies to West Mont. Thus, T.M.B. was a voluntary occupant of the group home and participant in the services West Mont provided pursuant to the decisions made by her guardian. However, what is different here is the relationship between the parties, and the assessment of whether a principal is "*in such relation* to another that he has a duty to protect, or to see that due care is used to protect, such other from harm . . . ." Restatement (Second) of Agency § 214, cmt. e. (Emphasis added.) This was a point made by the U.S. District Court in *Smith*, explaining that its duty determination under § 214 rested heavily on the nature of the relationship between the parties:

> The Court emphasizes that it conducted a two-part analysis, based on its reading of *Paull*, to find a nondelegable duty on the facts of this case. First the Court found that Montana statutory law recognizes the State's responsibility for children and families under its abuse and neglect jurisdiction. Second—and importantly—the Court determined that when the State injects itself into families under the applicable chapter and statute, *its relationship is "significant" and "continuing."* Cf. *Paull*, 218 P.3d at 1205 . . . . In other words, the Court cautions future litigants that this Order does not stand for the proposition that, if a governing or relevant statute exists, a nondelegable duty automatically follows under § 214.

*Smith*, 446 F. Supp. 3d at 691, n.5 (emphasis added).

26

¶34    T.M.B. is a physically and mentally compromised person whose wellbeing is heavily dependent upon her relationship with West Mont.  As reported in a social history, T.M.B. is "vulnerable in all areas due to her disabilities.  She requires 24 hours of supervision to keep her safe and healthy."  Her dependence is well known to West Mont, having served as T.M.B.'s host provider for decades, and the level of active care required to maintain T.M.B.'s health and safety is re-visited at least annually during meetings with CCM in reviewing her PSP.  West Mont provides more than strictly vocational, educational, or even residential services to T.M.B.; its group home and the support offered therein afford T.M.B. the ability to live outside a more institutionalized setting.  Absent any family, T.M.B. is entirely reliant upon West Mont for care.  West Mont and T.M.B.'s relationship is necessarily close and continuing, reflecting more of a caretaker/dependent association than that of a service provider and recipient.

¶35    Any nondelegable duty owed to T.M.B. by West Mont would, therefore, arise from its close relationship with T.M.B., as does that of a common carrier.  As noted above, the Legislature recognized the nondelegable duty of a carrier to its passenger established by the common law in determining to repeal § 69-11-107, MCA, in 2023. The nondelegable duty for common carriers is based on the relationship between passengers and those they entrust to get them from point to point safely, whether by train, *see Shepherd*, airplane, *Rogers v. Western Airline*, 184 Mont. 170, 177, 602 P.2d 171, 175 (1979), or even elevator, *Cash v. Otis Elevator Co.*, 210 Mont. 319, 324, 684 P.2d 1041, 1043 (1984).  T.M.B. is as dependent—or more—upon West Mont for her daily health and safety as a passenger who voluntarily boards a train is dependent upon the railroad.  DPHHS' Incident Management

27

Procedures Manual acknowledges the responsibility of state contractors in caring for disabled persons entrusted to them, stating its purpose in implementing the manual is to "emphasize prevention and staff involvement in order to provide safe environments for the people they serve." T.M.B. cites to *Stropes v. Heritage House Childrens Ctr., Inc.*, 547 N.E. 2d 244 (Ind. 1989), where the court applied § 214 to the relationship between a severely disabled person and a group home:

> The imposition of liability under the common carrier exception is premised on the control and autonomy surrendered by the passenger to the carrier for the period of accommodation. . . . Second, the special duties of the common carrier are said to arise from the fact that the passenger has entrusted his safety, as a bailor entrusts his goods, to the custody and safekeeping of the carrier. . . . When Heritage accepted David as a resident of its facility, it was fully cognizant of the disabilities and infirmities he suffered which rendered him unable to care for himself and which, in fact, undoubtedly formed the basis of their relationship. . . . Given the degree of David's lack of autonomy and his dependence on Heritage for care and the degree of Heritage's control over David and the circumstances in which he found himself, we find that Heritage assumed a nondelegable duty to provide protection.

*Stropes*, 547 N.E.2d at 253-54. While there are differing facts as well, we find the parallels between *Stropes* and T.M.B. sufficient to support the conclusion that West Mont owed a nondelegable duty of care to T.M.B. under § 214. We thus reverse the District Court's determination as to West Mont. The holding in *Maguire*, premised upon the determination there not to adopt § 214 of the Restatement, has been effectively overruled, beginning with the determination to adopt § 214 in *Paull* and our recognition in *L.B.* that we had adopted it "without limitation." *L.B.*, ¶ 24. As we noted in *Paull*, this does not mean West Mont is strictly liable "for any injury that results . . . regardless of fault." *Paull*, ¶ 38. It does mean,

28

however, that West Mont "may be held liable for the tortious acts or omissions of its agents undertaking" the duty running to T.M.B.  *Paull*, ¶ 38.

¶36   Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ JIM RICE

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR

Justice Ingrid Gustafson, concurring in part and dissenting in part.

¶37   While I do not agree completely with everything said in the Court's analysis in Issue 2, I agree with its ultimate determination that West Mont owed a nondelegable duty of care to T.M.B. under Restatement (Second) of Agency § 214.  I therefore concur as to Issue 2.  I dissent, however, from the majority's determination in Issue 1 that the State did not also owe T.M.B. a nondelegable duty of care under § 214.

¶38   In *Maguire v. State*, 254 Mont. 178, 835 P.2d 755 (1992), this Court reversed a district court's grant of partial summary judgment in favor of Maguire, a mother whose developmentally disabled daughter was raped and impregnated by a Montana Developmental Center employee, and against the State because the district court based its decision on Restatement (Second) of Agency § 214, which this Court had not yet adopted. *Maguire*, 254 Mont. at 182, 835 P.2d at 758.  That section of the Restatement states:

> A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

Restatement (Second) of Agency § 214 (Am. L. Inst. 1958). We reviewed our previous decisions regarding the respondeat superior doctrine and associated exceptions, noted "we have limited application of the non-delegable duty exception to the respondeat superior doctrine to instances of safety where the subject matter is inherently dangerous," and declined to extend the nondelegable duty exception or adopt Restatement (Second) of Agency § 214 because "such a major change to the respondeat superior doctrine is best left to the legislature." *Maguire*, 254 Mont. at 182-85, 835 P.2d at 758-60. Twenty-seven years later, with no response from the Legislature, this Court adopted Restatement (Second) of Agency § 214 "as an appropriate statement of the law in Montana." *Paull v. Park Cnty.*, 2009 MT 321, ¶ 37, 352 Mont. 465, 218 P.3d 1198. Our adoption of § 214 in *Paull* was done "without limitation[.]" *L.B. v. United States*, 2022 MT 166, ¶ 24, 409 Mont. 505, 515 P.3d 818.

¶39 The State of Montana has statutorily provided for the care, treatment, and habilation of persons with developmental disabilities. Section 53-20-101, et seq., MCA. Its stated purpose is to "secure for each person who may be a person with developmental disabilities such treatment and habilitation as will be suited to the needs of the person and to assure that such treatment and habilitation are skillfully and humanely administered with full respect for the person's dignity and personal integrity [and to] accomplish this goal whenever possible in a community-based setting[.]" Section 53-20-101(1)-(2), MCA. The

30

State sought to care for those with developmental disabilities in the community, rather than at State facilities. Section 53-20-301, MCA. In 2015, the Legislature passed SB 411, which required the closure of the Montana Developmental Center because the intent of the Legislature was "to provide services to individuals with developmental disabilities in the community." 2015 Mont. Laws ch. 444, § 1. With the closure of the designated State facility for developmentally disabled individuals, the State was to "work with community providers to develop necessary services." 2015 Mont. Laws ch. 444, § 1. In essence, the State, recognizing its need to care for its vulnerable developmentally disabled residents, outsourced the job to private providers such as West Mont. A developmental disabilities program (DDP) is also provided for in the Administrative Rules of Montana, with the stated purpose "to provide quality community-based services in the least restrictive environment which promotes the principle of normalization for persons who are developmentally disabled." Admin. R. M. 37.34.101(1) (2013). For an adult receiving services under the DDP, those services "must be provided in environments which enhance the quality of life for the individual," Admin. R. M. 37.34.701(3) (1995), and must assist the person to "reside, work and play in *safe*, healthy, integrated environments." Admin. R. M. 37.34.701(4)(d) (1995) (emphasis added); *see also* Admin. R. M. 37.34.702(3)(b) (1995) and Admin. R. M. 37.34.706(3), (6)(a) (1995). The private providers must conduct a screening and background check of their employees and, both upon hire and then annually, verify to the State that each staff person can perform the tasks and responsibilities of their position. Admin. R. M. 37.34.2102(2)-(4) (2013). All told, the State, through its statutes and rules, has committed itself to the care, safety, and wellbeing of its developmentally

31

disabled residents and has chosen to accomplish those goals through the use of outside providers like West Mont, rather than directly providing services through State facilities. While the State may delegate the actual provision of services to providers like West Mont, under § 214 it may not delegate the duty of care to developmentally disabled individuals it has committed itself to by statute.

¶40    "[A] nondelegable duty is an affirmative obligation to ensure the protection of the person to whom the duty runs." *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 396, 102 S. Ct. 3141, 3153 (1982).  "The concept of a nondelegable duty imposes upon the principal not merely an obligation to exercise care in his own activities, but to answer for the well-being of those persons to whom the duty runs.  The duty is not discharged by using care in delegating it to an independent contractor." *Gen. Bldg. Contractors Ass'n*, 458 U.S. at 395, 102 S. Ct. at 3152-53 (internal citation omitted). "[O]ne may have a duty to see that due care is used in the protection of another, a duty which is not satisfied by using care to delegate its performance to another but is satisfied if, and only if, the person to whom the work of protection is delegated is careful in giving the protection.  In this [] class, the duty of care is non-delegable."  Restatement (Second) of Agency § 214 cmt. a (Am. L. Inst. 1958).  The nondelegable duty of care can also exist through voluntary relations: "A master or other principal may be in such relation to another that he has a duty to protect, or to see that due care is used to protect, such other from harm although not caused by an enterprise which has been initiated by the master or by things owned or possessed by him.  This duty may be created by contract, as where one agrees to protect another, or may be imposed by law as incident to a relation voluntarily entered into,

as the relation of carrier and passenger, or by statute." Restatement (Second) of Agency § 214 cmt. e (Am. L. Inst. 1958). Because the nondelegable duty of care for developmentally disabled individuals receiving services under the DDP exists pursuant to statute, we need not parse the language of the State's contract with West Mont. The State's duty to T.M.B. remains whether or not it acted with perfect care in delegating the provision of services to West Mont.

¶41 With the adoption of § 214 in *Paull*, this Court recognized "an exception to the general rule that an employee must be acting within the scope of employment for the employer to be liable for the employee's conduct. Section 214 holds employers liable for actions taken by an employee outside the scope of their employment where the employer maintains a non-delegable duty." *Bilbruck v. Valley Cnty.*, No. CV-21-40-GF-BMM, 2024 U.S. Dist. LEXIS 116821, *4-5 (D. Mont. July 2, 2024) (citing *Smith v. Ripley*, 446 F. Supp. 3d 683, 688 (D. Mont. 2020) (internal citation omitted)). "[A] principal who owes a nondelegable duty of care to others remains liable for the harm caused to others by the misconduct of its agent, even for misconduct committed outside the scope of employment." *Shepherd v. Amtrak*, No. CV-17-40-GF-BMM, 2018 U.S. Dist. LEXIS 226726, *4 (D. Mont. Aug. 15, 2018). We may find a nondelegable duty of care when the State has a relationship which is "significant and ongoing." *Smith*, 446 F. Supp. 3d at 691.

¶42 In determining the State did not owe T.M.B. a nondelegable duty of care, the majority finds the State did not have a close, continuing relationship with her. A review of T.M.B.'s life shows just the opposite. T.M.B. was born in 1964. She is cognitively impaired and has Down syndrome, Pica disorder, and dementia. She is also visually

33

impaired—"mostly blind," deaf, and nonverbal. T.M.B. is "vulnerable in all areas due to her disabilities" and "requires 24-hour supervision to keep her safe and healthy." In 1966, T.M.B., age two, was placed at the Warm Springs Hospital by the State and abandoned by her family. After three years at Warm Springs, the State transferred her to the Boulder River Hospital and School in 1969, where she lived until 1977. At that time, the State placed T.M.B. in foster care, which lasted until she lost foster care services in 1987. In 1987, the State placed her with West Mont for residential and vocational services on a "permanent 'emergency placement[.]'" At the time T.M.B. was placed at West Mont, she had no guardian and was a ward of the State, as she had been since she was two years old. T.M.B. continued to reside at West Mont pursuant to the State's placement, without a guardian, until 2004. In 2004, T.M.B. needed oral surgery and her dentist noted, due to her disabilities, she was unable to consent to sedation. The State petitioned the District Court for a limited medical guardianship "[d]ue to [T.M.B.'s] inability to consent to health care issues," seeking the appointment of Capital City Case Management (CCCM) as T.M.B.'s medical guardian. CCCM was appointed as T.M.B.'s temporary, and then permanent, medical guardian in 2004. In 2018, CCCM signed a Freedom of Choice and Consent Form on behalf of T.M.B., choosing to continue receiving services at West Mont under the Medicaid waiver program. T.M.B. continued to reside at her West Mont group home where, in 2019, she was raped by a West Mont employee. CCCM was in fact not appointed T.M.B.'s full legal guardian until 2021, two years after the rape at issue in this case.

34

¶43 The majority likewise understates the State's involvement in T.M.B.'s care, writing that the "State had no involvement in West Mont's day-to-day operations and provisions of services, beyond the contractual obligations for auditing, licensing, and oversight of the expenditure of Medicaid funds." Opinion, ¶ 27. But T.M.B.'s Personal Support Plan (PSP) tells a different story. The State, through the DDP, is listed as the Case Manager for T.M.B., while CCCM is listed as a "Limited Guardian (medical)" and the PSP notes that CCCM "provides limited guardianship for medical decisions." Both the State and CCCM are listed as a part of the "team" responsible for the PSP, along with two West Mont employees. At the time T.M.B. was raped at West Mont in 2019, the case manager—in T.M.B.'s case, the State—was required to be a part of the PSP team. Admin. R. M. 37.34.1107(1)(d) (2013) (repealed 2024). That team reviewed and re-wrote T.M.B.'s PSP. The State, as Case Manager, was, according to the PSP itself, responsible for completing the General Information, Personal Introduction, Personal Profile, Personal Finance, Visions, Outcomes, and Signatures of the PSP. T.M.B.'s PSP provides for far more than oversight of the expenditure of Medicaid funds. It covers essential elements related to the care of T.M.B., from what she likes to what is required to keep her safe and healthy— including specific directions for her medication protocol, eating protocol, C-PAP machine protocol, and bathing protocol. The PSP noted it was explained to T.M.B. that the State would "check[ her] progress in the plan." While all four members of the team, including the State, signed the PSP, the space for T.M.B.'s signature was filled in with a note saying "[T.M.B.] only attended for a bit before going on an outing. [T.M.B.] does not sign documents[.]" The State, as Case Manager, was also responsible for the PSP's ultimate

35

approval and signed the PSP with a note that "This plan is approved. It is person-centered, and the individual was involved in its development. The plan was developed based on assessments of the person's needs, vision, preferences and health and safety risk factors. In addition, all services listed on the person's cost plan are identified in actions in this plan of care."

¶44 Finally, the majority's focus on the allegedly "voluntary" nature of T.M.B. residing at the West Mont group home where she was raped in 2019 simply misses the mark. Section 214 applies to voluntary actions when the duty of care is provided by statute. *See* Restatement (Second) of Agency § 214 cmt. e (Am. L. Inst. 1958). But more importantly, in my view, T.M.B.'s long-term residence at West Mont was a continuation of her placement by the State, which was not a voluntary act. T.M.B. began residing at West Mont in 1987 on a "permanent 'emergency placement,'" after she lost foster care, not through any choice of her own. She continued living there, pursuant to the State's placement and without a guardian, for 17 years before a limited medical guardian was appointed for her so she could have oral surgery. T.M.B. remained living at her West Mont group home after the appointment of CCCM as her limited medical guardian for a further 14 years after that before CCCM, as her medical guardian, signed the Freedom of Choice and Consent Form on behalf of T.M.B. in 2018, choosing to continue receiving services at West Mont under the Medicaid waiver program. One year later, after living in West Mont for *32 years* after the State initially placed her there, T.M.B. was raped at the group home— the incident giving rise to the present litigation.

36

¶45 T.M.B. argues CCCM's limited medical guardianship was insufficient to confer authority to determine her residence, which the majority handwaves away in a footnote recognizing CCCM did not obtain a full guardianship of T.M.B. until 2021, but nevertheless claiming "it is clear that T.M.B.'s continued stay at West Mont was long effectuated by exercise of apparent authority from the first guardianship, and not by action of the government or others." Opinion, ¶ 6 n. 3. This conclusion is curious because the action of the government, placing T.M.B. at West Mont in 1987, is how T.M.B. came to reside at West Mont. She was not appointed a limited medical guardianship, which is insufficient to convey authority to determine her residence, *see* § 72-5-321(1), (2)(a),(b), MCA, until 2004. The first Freedom of Choice and Consent Form signed by CCCM on behalf of T.M.B. in the record before us? That is dated in 2018, less than a year before the incident giving rise to this case and 31 years after the State placed T.M.B. at West Mont. A far cry from the majority's claim that CCCM "made *regular decisions about T.M.B.'s placement* and care." Opinion, ¶ 26 (emphasis added). In my view, any "apparent authority" for T.M.B.'s continued residence at West Mont flows from the State's placement of her there in 1987 and her uninterrupted residence from that time until the time of the 2019 incident, not from a form signed by a limited medical guardian in 2018.

¶46 In response to this dissent, the majority simply chooses to close its eyes to the inconvenient facts of T.M.B.'s case and double down on its insistence that T.M.B. was at West Mont by personal choice. The Opinion now recounts that "T.M.B.'s placement at West Mont has long been a choice effectuated by her guardian, not mandated by the State, and is considered by the statutes to be a 'voluntary use' of community facilities, in contrast

37

to the judicial commitment of a seriously developmentally disabled person." Opinion, ¶ 31. As I have already pointed out, it was the State who placed T.M.B. at West Mont—on a "permanent 'emergency placement'"—in 1987, and, according to the record before us, T.M.B. continued to reside at West Mont pursuant to the State's placement for 31 years prior to her limited medical guardian signing the Freedom of Choice and Consent Form in 2018 and purportedly consenting on T.M.B.'s behalf to voluntarily continue that placement. CCCM, as limited medical guardian, did not have the authority to determine T.M.B.'s residence in 2018. But either way, a single form in 2018 purporting to consent to continuing residing where the State placed T.M.B. 31 years prior is certainly not a choice "long . . . effectuated by her guardian[.]" Opinion, ¶ 31. The State has statutorily accepted its duty to care for developmentally disabled individuals and chosen to delegate its provision of services to developmentally disabled individuals to private providers like West Mont. The majority has determined, in essence, that the only developmentally disabled individuals the State owes a duty of care to are those seriously developmentally disabled individuals who are judicially committed. This dramatic contraction of the State's statutorily-accepted duty is a policy choice made by the Court, not what is required under the law and § 214.

¶47 Putting it all together, it is readily apparent the State owed T.M.B. a nondelegable duty of care under § 214. The State, by statute, has committed itself to the care, safety, and wellbeing of its developmentally disabled residents like T.M.B. The State has been in a significant, ongoing relationship with T.M.B. for nearly her entire life—beginning at the age of two—and directed her placement to Warm Springs Hospital in 1966, to Boulder

38

River Hospital and School in 1969, to foster care in 1977, and to West Mont in 1987. The State was T.M.B.'s case manager and a member of T.M.B.'s care team responsible for her PSP, maintaining an active role in T.M.B.'s care up to, and beyond, when she was raped at the West Mont group home in 2019. When the State chooses to carry out its duties to those developmentally disabled individuals with which it has a significant and ongoing relationship with—such as T.M.B.—by outsourcing them to agents like West Mont, "it lacks immunity from vicarious liability under the nondelegable duty rule." *Smith*, 446 F. Supp. 3d at 692. Again, while the State may delegate the actual provision of services to providers like West Mont, under § 214 it may not delegate the duty of care to developmentally disabled individuals it has committed itself to by statute. Applying a nondelegable duty of care under § 214 would simply mean the State cannot also outsource its responsibility to those same vulnerable developmentally disabled residents when they are preyed upon by an employee of those private providers.

¶48 T.M.B. is a profoundly developmentally disabled individual who has been a de facto ward of the State since she was two years old. The State has been in a close, continuous relationship with T.M.B., who is completely dependent upon others for her care and safety, for nearly 60 years. It placed her at Warm Springs, the Boulder River Hospital and School, into foster care, and at West Mont. It therefore owed a nondelegable duty of care to T.M.B. under § 214. I would reverse the District Court regarding Issue 1. I dissent from the majority's contrary determination.

/S/ INGRID GUSTAFSON

39

Justices Laurie McKinnon and James Jeremiah Shea join in the concurring and dissenting Opinion of Justice Gustafson.

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA